[Civ. No. 5900. Fifth Dist. Mar. 28, 1983.]

DUSTIN SOLDANO, a Minor, etc., Plaintiff and Appellant, v.
HOWARD O'DANIELS, Defendant and Respondent.

■■■■■■■■■■■■■

COUNSEL

Bostwick & Rowe and Everett P. Rowe for Plaintiff and Appellant.

Hoge, Fenton, Jones & Appel and Wayne H. Maire for Defendant and Respondent.

OPINION

ANDREEN, J.—Does a business establishment incur liability for wrongful death if it denies use of its telephone to a good samaritan who explains an emergency situation occurring without and wishes to call the police?

■ This appeal follows a judgment of dismissal of the second cause of action[1] of a complaint for wrongful death upon a motion for summary judgment. The motion was supported only by a declaration of defense counsel. Both briefs on appeal adopt the defense averments:

"This action arises out of a shooting death occurring on August 9, 1977. Plaintiff's father[2] [Darrell Soldano] was shot and killed by one Rudolph Villanueva on that date at defendant's Happy Jack's Saloon. This defendant owns and operates the Circle Inn which is an eating establishment located

---

[1]This was the only cause of action against defendant Howard O'Daniels. The judgment is therefore an appealable order. (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 568 [139 Cal.Rptr. 97, 565 P.2d 122].)

[2]Any right of the plaintiff to recover would, of course, be derivative.

across the street from Happy Jack's. Plaintiff's second cause of action against this defendant is one for negligence.

"Plaintiff alleges that on the date of the shooting, a patron of Happy Jack's Saloon came into the Circle Inn and informed a Circle Inn employee that a man had been threatened at Happy Jack's. He requested the employee either call the police or allow him to use the Circle Inn phone to call the police. That employee allegedly refused to call the police and allegedly refused to allow the patron to use the phone to make his own call. Plaintiff alleges that the actions of the Circle Inn employee were a breach of the legal duty that the Circle Inn owed to the decedent." We were advised at oral argument that the employee was the defendant's bartender.[3] The state of the record is unsatisfactory in that it does not disclose the physical location of the telephone—whether on the bar, in a private office behind a closed door or elsewhere. The only factual matter before the trial court was a verified statement of the defense attorney which set forth those facts quoted above. Following normal rules applicable to motions for summary judgment, we strictly construe the defense affidavit. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) Accordingly, we assume the telephone was not in a private office but in a position where it could be used by a patron without inconvenience to the defendant or his guests. We also assume the call was a local one and would not result in expense to defendant.

There is a distinction, well rooted in the common law, between action and nonaction. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36].) It has found its way into the prestigious Restatement Second of Torts (hereafter cited as Restatement), which provides in section 314: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Comment c of section 314 is instructive on the basis and limits of the rule and is set forth in the footnote.[4] The distinction be-

---

[3] The defendant's liability would be affixed, if at all, by the concept of respondeat superior.

[4] "The rule stated in this Section is applicable irrespective of the gravity of the danger to which the other is subjected and the insignificance of the trouble, effort, or expense of giving him aid or protection.

"The origin of the rule lay in the early common law distinction between action and inaction, or 'misfeasance' and 'non-feasance.' In the early law one who injured another by a positive affirmative act was held liable without any great regard even for his fault. But the courts were far too much occupied with the more flagrant forms of misbehavior to be greatly concerned with one who merely did nothing, even though another might suffer serious harm because of his omission to act. Hence liability for non-feasance was slow to receive any recognition in the law. It appeared first in, and is still largely confined to, situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff.

"The result of the rule has been a series of older decisions to the effect that one human being, seeing a fellow man in dire peril, is under no legal obligation to aid him, but may sit on the dock,

tween malfeasance and nonfeasance, between active misconduct working positive injury and failure to act to prevent mischief not brought on by the defendant, is founded on "that attitude of extreme individualism so typical of anglo-saxon legal thought." (Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability*, pt. I, (1908) 56 U.Pa.L.Rev. 217, 219-220.)

Defendant argues that the request that its employee call the police is a request that it *do* something. He points to the established rule that one who has not created a peril ordinarily does not have a duty to take affirmative action to assist an imperiled person. (*Winkelman* v. *City of Sunnyvale* (1976) 59 Cal.App.3d 509, 511-512 [130 Cal.Rptr. 690].) It is urged that the alternative request of the patron from Happy Jack's Saloon that he be allowed to use defendant's telephone so that he personally could make the call is again a request that the defendant do something—assist another to give aid. Defendant points out that the Restatement sections which impose liability for negligent interference with a third person giving aid to another do not impose the additional duty to *aid* the good samaritan.[5]

The refusal of the law to recognize the moral obligation of one to aid another when he is in peril and when such aid may be given without danger and at little cost in effort has been roundly criticized. Prosser describes the case law sanctioning such inaction as a "refus[al] to recognize the moral obligation of common decency and common humanity" and characterizes some of these decisions as "shocking in the extreme. . . . [¶] Such decisions are revolting to any moral sense. They have been denounced with vigor by legal writers." (Prosser, Law of Torts (4th ed. 1971) § 56, pp. 340-341, fn. omitted.) A similar rule has been termed "morally questionable" by our Supreme Court. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435, fn. 5 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

Francis H. Bohlen, in his article *The Moral Duty to Aid Others as a Basis of Tort Liability*, commented: "Nor does it follow that because the law has not as yet recognized the duty to repair harm innocently wrought, that it will continue indefinitely to refuse it recognition. While it is true that the common law does not attempt to enforce all moral, ethical, or humanitarian duties, it is, it is sub-

---

smoke his cigar, and watch the other drown. Such decisions have been condemned by legal writers as revolting to any moral sense, but thus far they remain the law. It appears inevitable that, sooner or later, such extreme cases of morally outrageous and indefensible conduct will arise that there will be further inroads upon the older rule." (Rest.2d Torts, *supra*, § 314, com. c.)

[5]"One who knows or has reason to know that a third person is giving or is ready to give to another aid necessary to prevent physical harm to him, and negligently prevents or disables the third person from giving such aid, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving." (Rest.2d Torts, § 327.)

mitted, equally true that all ethical and moral conceptions, which are not the mere temporary manifestations of a passing wave of sentimentalism or puritanism, but on the contrary, find a real and permanent place in the settled convictions of a race and become part of the normal habit of thought thereof, of necessity do in time color the judicial conception of legal obligation. . . .

". . . . . . . . . . . . . . . . . . . . . .

"While courts of law should not yield to every passing current of popular thought, nonetheless, it appears inevitable that unless they adopt as legal those popular standards which they themselves, as men, regard as just and socially practicable, but which, as judges, they refuse to recognize solely because they are not the standards of the past of Brian, of Rolle, of Fineux, and of Coke; they will more and more lose their distinctive common law character as part of the machinery whereby free men do justice among themselves." (Bohlen, *op. cit. supra,* pt. II, 56 U.Pa.L.Rev. 316, 334-337.)

As noted in *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at page 435, footnote 5, the courts have increased the instances in which affirmative duties are imposed not by direct rejection of the common law rule, but by expanding the list of special relationships which will justify departure from that rule. For instance, California courts have found special relationships in *Ellis* v. *D'Angelo* (1953) 116 Cal.App.2d 310 [253 P.2d 675] (upholding a cause of action against parents who failed to warn a babysitter of the violent proclivities of their child), *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352] (upholding suit against the state for failure to warn foster parents of the dangerous tendencies of their ward), *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508] (sustaining cause of action against a sheriff who had promised to warn decedent before releasing a dangerous prisoner, but failed to do so). (*Tarasoff, supra,* at p. 436, fn. 9.)

And in *Tarasoff,* a therapist was told by his patient that he intended to kill Tatiana Tarasoff. The therapist and his supervisors predicted the patient presented a serious danger of violence. In fact he did, for he carried out his threat. The court held the patient-therapist relationship was enough to create a duty to exercise reasonable care to protect others from the foreseeable result of the patient's illness.

Section 314A of the Restatement lists other special relationships which create a duty to render aid, such as that of a common carrier to its passengers, an innkeeper to his guest, possessors of land who hold it open to the public, or one who has a custodial relationship to another. A duty may be created by an undertaking to give assistance. (See Rest.2d Torts, *supra,* § 321 et seq.)

Here there was no special relationship between the defendant and the deceased. It would be stretching the concept beyond recognition to assert there was a relationship between the defendant and the patron from Happy Jack's Saloon who wished to summon aid. But this does not end the matter.

It is time to reexamine the common law rule of nonliability for nonfeasance in the special circumstances of the instant case.

Besides well-publicized actions taken to increase the severity of punishments for criminal offenses,[6] the Legislature has expressed a societal imperative to diminish criminal activity. Thus, in 1965, it enacted a provision for indemnification of citizens for injuries or damages sustained in crime suppression efforts. (Former Pen. Code, § 13600, added by Stats. 1965, ch. 1395, § 1, p. 3315.) In that section the Legislature declared that "[d]irect action on the part of private citizens in preventing the commission of crimes against the person or property of others, or in apprehending criminals, benefits the entire public." The section does not require direct action by a private citizen; it merely recognizes the societal benefit if one does so. It was designed to stimulate active public involvement in crime control.[7] (Note, *California Enacts Legislation To Aid Victims of Criminal Violence* (1965) 18 Stan.L.Rev. 266.)

Crime is a blight on our society and a matter of great citizen concern. The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: The Police (1967) recognized the importance of citizen involvement in crime prevention: "[C]rime is not the business of the police alone. . . . The police need help from citizens, . . ." (*Op. cit. supra,* The Community's Role in Law Enforcement, ch. 9, p. 221, fn. omitted.) The commission identified citizen crime reporting programs in some cities. These have proliferated in recent years. (*Id.,* at p. 223.)

The National Advisory Commission on Criminal Justice Standards and Goals, Report on Community Crime Prevention (1973) stated: "Criminal justice professionals readily and repeatedly admit that, in the absence of citizen assistance, neither more manpower, nor improved technology, nor additional money will enable law enforcement to shoulder the monumental burden of

---

[6]See, e.g., Penal Code sections 667 (enhancement of sentence for habitual criminals, added by initiative measure, approved by the people, June 8, 1982), 667.5 (additional sentence enhancement for prior violent felonies), 667.7 (life term for certain habitual criminals), 667.6, subdivisions (c), (d) (full, separate, and consecutive sentences for multiple sex crimes), 1170.1 et seq. (Uniform Determinate Sentencing Act), 12022 et seq. (additional penalties for firearm use during a felony).

[7]Former Penal Code section 13600 was reenacted in 1969 as Government Code section 13970 and, among other changes, the Legislature added that "rescuing a person in immediate danger of injury or death as a result of fire, drowning, or other catastrophe" also benefits the entire public. (Stats. 1969, ch. 1111, § 3, p. 2168.)

combating crime in America." (*Op. cit. supra,* pt. I, Crime Prevention and The Citizen, ch. 1, Citizen Action, pp. 7-8.)

The Legislature has recognized the importance of the telephone system in reporting crime and in summoning emergency aid. Penal Code section 384 makes it a misdemeanor to refuse to relinquish a party line when informed that it is needed to call a police department or obtain other specified emergency services. This requirement, which the Legislature has mandated to be printed in virtually every telephone book in this state,[8] may have wider printed distribution in this state than even the Ten Commandments. It creates an affirmative duty to do something—to clear the line for another user of the party line—in certain circumstances.

In 1972 the Legislature enacted the Warren-911-Emergency Assistance Act. This act expressly recognizes the importance of the telephone system in procuring emergency aid. "The Legislature further finds and declares that the establishment of a uniform, statewide emergency [telephone] number is a matter of statewide concern and interest to all inhabitants and citizens of this state." (Gov. Code, § 53100, subd. (b).) The act also impliedly recognizes that "police, fire, medical, rescue, and other emergency services" are frequently sought by use of the telephone. (*Ibid.*) Further acknowledgment of the importance of the telephone system for summoning emergency aid is found in the act's provision that, by a specified date, all pay telephones "shall . . . enable a caller to dial '911' for emergency services, and to reach an operator by dialing '0', without the necessity of inserting a coin." (Gov. Code, § 53112.) Moreover, Pacific Telephone, the largest telephone company in California, recognizing that the telephone can at times be a lifeline, has provided since 1968 a basic minimum rate "designed for the customer needing inexpensive low-usage residential telephone service for essential calls (Lifeline Service)." (Cal. P.U.C. Tariff 4-T (RATE PRACTICE 4-T, 1st Revised Sheet 12).)

The above statutes are cited without the suggestion that the defendant violated a statute which would result in a presumption of a failure to use due care under Evidence Code section 669. Instead, they, and the quotations from the prestigious national commissions, demonstrate that "that attitude of extreme individualism so typical of anglo-saxon legal thought" may need limited reexamination in the light of current societal conditions and the facts of this case to determine whether the defendant owed a duty to the deceased to permit the use of the telephone.

 We turn now to the concept of duty in a tort case. The Supreme Court has identified certain factors to be considered in determining whether a duty is

---

[8] Penal Code section 384, subdivision (c).

owed to third persons. These factors include: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; cf. *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8-9 [31 Cal.Rptr. 847].)

We examine those factors in reference to this case. (1) The harm to the decedent was abundantly foreseeable; it was imminent. The employee was expressly told that a man had been threatened. The employee was a bartender. As such he knew it is foreseeable that some people who drink alcohol in the milieu of a bar setting are prone to violence. (2) The certainty of decedent's injury is undisputed. (3) There is arguably a close connection between the employee's conduct and the injury: the patron wanted to use the phone to summon the police to intervene. The employee's refusal to allow the use of the phone prevented this anticipated intervention. If permitted to go to trial, the plaintiff may be able to show that the probable response time of the police would have been shorter than the time between the prohibited telephone call and the fatal shot. (4) The employee's conduct displayed a disregard for human life that can be characterized as morally wrong:[9] he was callously indifferent to the possibility that Darrell Soldano would die as the result of his refusal to allow a person to use the telephone. Under the circumstances before us the bartender's burden was minimal and exposed him to no risk: all he had to do was allow the use of the telephone. It would have cost him or his employer nothing. It could have saved a life. (5) Finding a duty in these circumstances would promote a policy of preventing future harm. A citizen would not be required to summon the police but would be required, in circumstances such as those before us, not to impede another who has chosen to summon aid. (6) We have no information on the question of the availability, cost, and prevalence of insurance for the risk, but note that the liability which is sought to be imposed here is that of employee negligence, which is covered by many insurance policies. (7) The extent of the burden on the defendant was minimal, as noted.

The consequences to the community of imposing a duty, the remaining factor mentioned in *Rowland* v. *Christian, supra,* is termed "the administrative

---

[9]The moral right of plaintiff's decedent to have the defendant's bartender permit the telephone call is so apparent that legal philosophers treat such rights as given and requiring no supporting argument. (See Dworkin, Taking Rights Seriously (Harv.U. Press 1978) p. 99.) The concept flows from the principle that each member of a community has a right to have each other member treat him with the minimal respect due a fellow human being. (*Id.*, at p. 98.)

factor" by Professor Green in his analysis of determining whether a duty exists in a given case. (Green, *The Duty Problem in Negligence Cases*, I (1929) 28 Colum. L. Rev. 1014, 1035-1045; reprinted in Green, The Litigation Process in Tort Law; No Place to Stop in the Development of Tort Law (2d ed. 1977) pp. 174-184.) The administrative factor is simply the pragmatic concern of fashioning a workable rule and the impact of such a rule on the judicial machinery. It is the policy of major concern in this case.

As the Supreme Court has noted, the reluctance of the law to impose liability for nonfeasance, as distinguished from misfeasance, is in part due to the difficulties in setting standards and of making rules workable. (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 435, fn. 5.)

Many citizens simply "don't want to get involved." No rule should be adopted which would require a citizen to open up his or her house to a stranger so that the latter may use the telephone to call for emergency assistance. As Mrs. Alexander in Anthony Burgess' A Clockwork Orange learned to her horror, such an action may be fraught with danger. It does not follow, however, that use of a telephone in a public portion of a business should be refused for a legitimate emergency call. Imposing liability for such a refusal would not subject innocent citizens to possible attack by the "good samaritan," for it would be limited to an establishment open to the public during times when it is open to business, and to places within the establishment ordinarily accessible to the public. Nor would a stranger's mere assertion that an "emergency" situation is occurring create the duty to utilize an accessible telephone because the duty would arise if and only if it were clearly conveyed that there exists an imminent danger of physical harm. (See Rest.2d Torts, *supra,* § 327.)

Such a holding would not involve difficulties in proof, overburden the courts or unduly hamper self-determination or enterprise.

A business establishment such as the Circle Inn is open for profit. The owner encourages the public to enter, for his earnings depend on it. A telephone is a necessary adjunct to such a place. It is not unusual in such circumstances for patrons to use the telephone to call a taxicab or family member.

We acknowledge that defendant contracted for the use of his telephone, and its use is a species of property. But if it exists in a public place as defined above, there is no privacy or ownership interest in it such that the owner should be permitted to interfere with a good faith attempt to use it by a third person to come to the aid of another.

The facts of this case come very nearly within section 327 of the Restatement (see fn. 5, *ante*) which provides that if one knows that a third person is ready to

give aid to another and negligently prevents the third person from doing so, he is subject to liability for harm caused by the absence of the aid. Section 327 is contained in topic 8 of the Restatement, "Prevention of Assistance by Third Persons." The scope note for this topic provides that the "actor can prevent a third person from rendering aid to another in many ways including the following: . . . second, by interfering with his efforts to give aid; third, by injuring or destroying the usefulness of a thing which the third person is using to give aid *or by otherwise preventing him from using it . . . .*"[10] (Rest.2d Torts, *supra,* scope note, p. 145, italics added.)

We conclude that the bartender owed a duty to the plaintiff's decedent to permit the patron from Happy Jack's to place a call to the police or to place the call himself.

It bears emphasizing that the duty in this case does not require that one must go to the aid of another. That is not the issue here. The employee was not the good samaritan intent on aiding another. The patron was.

It would not be appropriate to await legislative action in this area. The rule was fashioned in the common law tradition, as were the exceptions to the rule. (See Prosser, *op. cit. supra,* at pp. 340-343.) To the extent this opinion expands the reach of section 327 of the Restatement, it represents logical and needed growth, the hallmark of the common law. It does not involve the sacrifice of other respectable interests.

The courts have a special responsibility to reshape, refine and guide legal doctrine they have created. (*People* v. *Drew* (1978) 22 Cal.3d 333, 347 [149 Cal.Rptr. 275, 583 P.2d 1318].) As our Supreme Court summarized in *People* v. *Pierce* (1964) 61 Cal.2d 879, 882 [40 Cal.Rptr. 845, 395 P.2d 893], in response to an argument that any departure from common law precedent should be left to legislative action, "In effect the contention is a request that courts abdicate their responsibility for the upkeep of the common law. That upkeep it needs continuously, as this case demonstrates."

The words of the Supreme Court on the role of the courts in a common law system are well suited to our obligation here: " 'The inherent capacity of the common law for growth and change is its most significant feature. Its develop- ment has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing civiliza- tion and the new conditions and progress of society, and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the coun- try.' . . .

---

[10]Prosser states: "Even though the defendant may be under no obligation to render assistance himself, he is at least required to take reasonable care that he does not prevent others from giv- ing it." (Prosser, *op. cit. supra,* at p. 348.)

"In short, as the United States Supreme Court has aptly said, 'This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law.' (*Hurtado* v. *California* (1884) 110 U.S. 516, 530 . . . .) But that vitality can flourish only so long as the courts remain alert to their obligation and opportunity to change the common law when reason and equity demand it: 'The nature of the common law requires that each time a rule of law is applied, it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice.' (Fns. omitted.) (15 Am.Jur.2d, Common Law, § 2, p. 797.) Although the Legislature may of course speak to the subject, in the common law system the primary instruments of this evolution are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them." (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 394 [115 Cal.Rptr. 765, 525 P.2d 669], fn. omitted.)

Examples of the growth of the common law in recent California cases are abundant.[11]

The creative and regenerative power of the law has been strong enough to break chains imposed by outmoded former decisions. What the courts have power to create, they also have power to modify, reject and re-create in response to the needs of a dynamic society. The exercise of this power is an imperative function of the courts and is the strength of the common law. It cannot be surrendered to legislative inaction.

Prosser puts it this way: "New and nameless torts are being recognized constantly, and the progress of the common law is marked by many cases of first impression, in which the court has struck out boldly to create a new cause of action, where none had been recognized before. . . . The law of torts is anything but static, and the limits of its development are never set. When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself

[11]See, e.g., *Turpin* v. *Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954]—creating "wrongful life" cause of action for special damages; *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]—adoption of rule of comparative negligence; *Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d 382—permitting spousal action for loss of consortium; *Rowland* v. *Christian, supra,* 69 Cal.2d 108—termination of distinctions between trespassers, licensees and invitees to determine liability of possessor of land; *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]—introduction of strict products liability; *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457]—abrogation of governmental immunity; *Silva* v. *Providence Hospital of Oakland* (1939) 14 Cal.2d 762 [97 P.2d 798]—overruling the doctrine of charitable immunity; *Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629 [92 Cal.Rptr. 678, 93 P.2d 562]—establishing that child may sue for prenatal injury.

operate as a bar to the remedy." (Prosser, *op. cit. supra,* at pp. 3-4, fns. omitted.)

The possible imposition of liability on the defendant in this case is not a global change in the law. It is but a slight departure from the "morally questionable" rule of nonliability for inaction absent a special relationship. It is one of the predicted "inroads upon the older rule." (Rest.2d Torts, *supra,* § 314, com. c.) It is a logical extension of Restatement section 327 which imposes liability for negligent interference with a third person who the defendant knows is attempting to render necessary aid. However small it may be, it is a step which should be taken.

 We conclude there are sufficient justiciable issues to permit the case to go to trial and therefore reverse.

Franson, Acting P. J., and Stanton, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.