617 A.2d 598

**David GRIFFITH**

v.

**The SOUTHLAND CORPORATION.**

**No. 1314, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Dec. 30, 1992.

Keith R. Siskind (Forman & Steinhardt, P.A., on the brief), Glen Burnie, for appellant.

J. Paul Mullen, Stacey H. Schoenfeld and Lord & Whip, P.A., Baltimore, for amicus curiae, Maryland Ass'n of Defense Trial Counsel.

Gary I. Strausberg, Randall D. Getz, and Janet Strausberg, for *amicus curiae*, Maryland Trial Lawyers' Association.

William A. Franch (Ronald H. Jarashow, Robert R. Smith and Franch & Jarashow, P.A., on the brief), Annapolis, for appellee.

Argued before ALPERT, BLOOM, ROSALYN B. BELL, CATHELL and HARRELL, JJ.

ALPERT, Judge.

This case is about a police officer who, when placed in a position of peril during the performance of his duties protecting patrons on a business premises, asked an employee of that business to summon aid. The appellee urges that its employee had no such duty. Under the circumstances of the case *sub judice*, we disagree.

■ Appellant, David Griffith, an off-duty police officer, became the victim of a savage beating while attempting to restore order on the premises of a 7–11 Store owned by the appellee, The Southland Corporation.[1] An employee of Southland was asked to summon aid, refused, and "as a direct and proximate result," Griffith allegedly "sustained severe and permanent injuries." But according to Southland, "the 7–11 clerk was under no duty ... to take any affirmative action to assist this police officer" who was being assaulted in the line of duty.

Because we disagree with the appellee's argument that Southland owed Officer Griffith no legal duty to summon assistance on his behalf, we shall reverse and remand for further proceedings. We do not quarrel with appellee's assessment that Griffith was acting in his capacity as a police officer when he was injured. Rather, we challenge

---

1. As the trial court disposed of this case by way of summary judgment, the evidence presented for our review of the record, which includes affidavits and answers to interrogatories, must be reviewed in a light most favorable to the appellant, and the facts herein mentioned are presented in that vein. *Syme v. Marks Rentals, Inc.*, 70 Md.App. 235, 520 A.2d 1110 (1987). Our standard, of course, is "whether the trial court was legally correct." *Heat & Power v. Air Products*, 320 Md. 584, 591–92, 578 A.2d 1202 (1990).

the conclusion that the "fireman's rule" [2] prevents Griffith from seeking redress for his injuries. Indeed, Maryland case law and considerations of public policy support the opposite result. Upon remand, it can be determined, *inter alia*, whether Southland's employee did, indeed, telephone the police when requested to do so and whether, if the employee did not make the call, that failure was the proximate cause of Griffith's injuries. As discussed *infra*, there exists in these regards a genuine dispute of material fact.

### Facts and Proceedings

Appellant, an Anne Arundel County Police Officer, was off duty when he, along with his son and several friends of his son, went in a pickup truck to the 7–11 convenience store in Ferndale, Maryland. The store is owned and operated by appellee. Having purchased some snack food, appellant and his companions consumed it while seated in their truck on the 7–11 parking lot. Another vehicle carrying the three individual defendants was either in the parking lot already or pulled in shortly thereafter (the witnesses' recollections of events diverge upon occasion). In any event, there is general agreement that the individual defendants became boisterous and began yelling obscenities at a female member of appellant's group. As appellant's truck was leaving the parking lot, one of the three individual defendants threw a beer can that struck appellant's son.

The pickup truck stopped. Appellant got out and started toward the three individuals when another beer can was thrown, this time striking appellant in the face. The individual defendant who threw that can then rapidly approached appellant and struck him in the face. Appellant grappled with him, yelled that he was a police officer, and told his assailant that he was under arrest. The struggle continued, with appellant repeating that he was a police officer. The two other individuals joined in the assault on appellant, and the fight spilled over to a gasoline station

---

2. *See infra* section b, for a discussion of the Fireman's Rule.

across the street. The station attendant called the police and attempted to help appellant, but he was attacked as well. Appellant then endeavored to assist the station attendant but his efforts were thwarted by kicks and blows from the defendants. The operator of the pickup truck in which appellant was riding came to the aid of appellant and he was punched by one of the individual defendants.

The genuine dispute of material fact is raised by an affidavit of the appellant's son, Mathew Griffith. According to Mathew's affidavit, after the struggle began between appellant and the defendant who had hurled the beer can at him, and after appellant told his assailant that appellant was a police officer and the assailant was under arrest, appellant yelled, "Call the police." Mathew swore in his affidavit that he instantly went to the door of the 7–11, stuck his hand in the doorway (the door was propped open by cases of sodas), and, after getting the clerk's attention, yelled to her to contact the police and that a police officer needed help. He then returned to the area of the struggle. Thirty seconds later, the affidavit continues, he went back into the store and yelled to the female clerk to call the police "and notify them it is a Code 13 for ID # A–436, which means than an officer is down and needs help." A–436 was appellant's identification number. The affidavit continues with assertions that the female clerk ignored Mathew's request and laughed at him. The clerk then moved the soda cases that had been propping open the front door so that the door closed. Mathew went back outside in time to see one of the three individual defendants seize a tire iron with which he struck appellant and the service station attendant who had tried to assist appellant. Finally, according to his affidavit, Mathew returned to the 7–11 store, jumped over the counter, grabbed the phone, dialed 911, yelled over the phone that it was a Code 13 for ID # A–436, and told the clerk to give the operator the address for the store. About two minutes later, a county police car arrived; appellant was then lying on the ground and the three assailants were attempting to leave the 7–11 parking

lot in their vehicle. The entire episode occurred over a period of about seven minutes.

The three ruffians were apprehended and arrested. They were later charged with and convicted of various offenses arising from their assault upon appellant. According to the affidavit of the 7–11 clerk, Diane Lockner, she was requested to call the police but once and did make the call.

Appellant filed a civil action in the Circuit Court for Anne Arundel County against appellee and against the three young ruffians who had committed the unprovoked assault and battery upon him while he was on the parking lot of the convenience store. The court granted appellee's motion for summary judgment and, pursuant to Md.Rule 2–602(b), certified that judgment as final. This appeal followed, wherein appellant raised the single issue:

Does the fireman's rule preclude an action by an off-duty police officer against a store owner when he is assaulted and battered due to the negligence of an employee of the store?

On April 6, 1992, this court heard argument by the parties and, by order of this court of September 4, 1992, scheduled reargument requesting the parties address the following issues:

(a) When a police officer is in danger, in the performance of his or her duties protecting patrons on the premises of a business, and requests, directly or indirectly, that an employee of the business call for assistance via the 911 system, (see Md.Ann.Code art. 41, § 18–101) or otherwise, does that employee, qua employee (as agent of the owner of the premises) have a duty to do so if he or she can do so without danger to the owner or employee?

(b) If such a duty exists, is a breach of that duty a negligent act not protected by the "fireman's rule" in that the failure to summons aid occurred after the commencement of the officer's protective function and was, therefore, "outside his anticipated occupational hazards"?

*See Flowers v. Rock Creek Terrace*, 308 Md. 432 [520 A.2d 361] (1987).

(c) If such a duty exists, is a breach of that duty, *i.e.*, the failure to call for assistance, wilful or wanton misconduct, thus removing the case from the protection of the "fireman's rule"?

We also requested and received Amicus Curiae briefs from the Maryland Trial Lawyers' Association and the Maryland Association of Defense Trial Counsel.

### a. The Duty

Relying upon *Davis v. Johns Hopkins Hospital*, 86 Md. App. 134, 585 A.2d 841, *cert. granted*, 323 Md. 115, 591 A.2d 506 (1991), and Restatement (Second) of Torts § 314 (1986), appellee argues that there was no legal duty on the part of the clerk to act in any manner for the aid of the appellant. Appellee cites numerous authorities, contending that there is not now, and should not be, such a duty. The short answer to this contention was provided by the Court of Appeals in *Flowers, supra,* when that Court held that a policeman *is* owed a duty of care when confronted with a peril which is neither reasonably foreseeable nor part of his anticipated occupational hazard. *Flowers*, 308 Md. at 448, 520 A.2d 361. Notwithstanding this direct and cogent response, we shall address appellee's seven point attack.

### 1. *Foreseeability*

■ Appellant argues that no duty to call for assistance should be placed upon the store clerk because the injury was an unforeseeable result of her action. We disagree. The affidavit of appellant's son states that the clerk was told there was an officer down who needed assistance. As Judge Bishop said for the Court in *Medina v. Meilhammer*, 62 Md.App. 239, 247, 489 A.2d 35 (1985): "The test is whether the injury sustained was that which was reasonably foreseeable, in light of the surrounding circumstances." Clearly, a trier of the fact could find it foresee-

able that a delay in providing needed assistance could exacerbate any harm already done.

### 2. *Certainty of Harm*

■ Appellee suggests that there is no showing that the failure to call for aid resulted in any harm to the appellant. This is merely an issue of proximate cause and is to be determined at trial by the trier of fact. As we noted in *Meilhammer, supra:*

> Proximate cause must "be decided in a common sense fashion in light of the attendant facts and circumstances, and, unless the facts are undisputed and admit of but one inference, the question is for the jury." The court should not indulge in refinements and subtleties as to causation which would defeat the ends of justice.

*Meilhammer,* 62 Md.App. at 247, 489 A.2d 35.

### 3. *Policy of Preventing Harm (Whether failure to call "911" should be a cause of action.)*

Contrary to appellee's assertion, we do not suggest the creation of a general cause of action for failure to make use of the 911 system.

### 4. *Closeness of Connection Between Conduct and Injury*

■ Once again, appellee argues that proximate cause is lacking in this case, and once again we must say that this is an issue of fact to be determined by the trier of fact. Appellee argues that Griffith's injuries were suffered at the hands of the three teens whose conduct was an independent superseding cause. "Negligence which constitutes a proximate cause of an injury need not necessarily be the sole cause." *Atlantic Mutual v. Kenney,* 323 Md. 116, 127, 591 A.2d 507 (1991).

The cases cited by appellee in this argument are distinguishable. *Tucker v. KFC Nat'l Mgmt. Co.,* 689 F.Supp. 560 (D.Md.1988), where it was held that a shopkeeper was not liable to a patron, who was stabbed by another patron,

for failing to post security guards, is inapposite because the spontaneity of the stabbing was such that a security guard could not have anticipated nor prevented it.

In *Rodney v. Mansur*, 219 So.2d 305 (La.Ct.App.1969), defendant, a patron of a saloon, was shot by another patron and sued the owner for failing to call the police immediately upon seeing the second patron's gun. In that case, the trial court made a specific *finding of fact* that the delay did not put defendant in a worse position because the police would not have arrived prior to the shooting.

### 5. *Burden on Defendant*

■ Appellee admits that the burden upon the clerk to place the call was minimal; appellee argues, however, that because there were phones *outside* which appellant's son *could* have used (but instead chose not to), there was a superseding and intervening act of negligence. This is no more than a claim of "imputed contributory negligence" which, at best, is a matter for the trier of fact. *See* 65 C.J.S. *Imputed Negligence* § 157 (1964); Prosser & Keeton, *The Law of Torts* § 74 (5th ed. 1984).

### 6. *Consequences to the Community*

We disagree that the duty imposed today is an unworkable and global change in Maryland law. The rule is simple and narrow, as expressed *infra* in section b.

### 7. *Abuse of 911*

Finally, appellee suggests that if the clerk had called 911 upon the son's request and no emergency had existed, she could be liable for criminal misuse of the telephone. This suggestion is ludicrous.

### b. The Fireman's Rule

The Court of Appeals, in *Flowers*, 308 Md. at 447, 520 A.2d 361, held that "as a matter of public policy, firemen and police officers generally cannot recover for injuries attributable to the negligence that requires their assis-

tance." The Court explained that the policy derives from the obligation that emergency personnel undertake to confront hazards on the public's behalf and added that "[s]omeone who negligently creates the need for a public safety officer will not be liable to a fireman or policeman for injuries caused by this negligence." [3] The *Flowers* opinion demonstrates the court's willingness to allow recovery under certain circumstances:

We reiterate, however, that firemen and policemen are not barred from recovery for all improper conduct. Negligent acts not protected by the fireman's rule may include failure to warn the firemen of pre-existing hidden dangers where there was knowledge of the danger and an opportunity to warn. They also may include acts which occur subsequent to the safety officer's arrival on the scene and which are outside his anticipated occupational hazards. As indicated by this Court in *Aravanis [v. Eisenberg*, 237 Md. 242, 206 A.2d 148 (1965) ], the fireman's rule should not apply "when the fireman sustains injuries after the initial period of his anticipated occupational risk, or from perils not reasonably foreseeable as part of that risk[.]" In these situations a fireman or policeman is owed a duty of care.

*Id.* 308 Md. at 448, 520 A.2d 361 (footnote and citation omitted).

When we apply these principles to the case *sub judice*, it is crystal clear that the appellee has erred in concluding that Griffith may not recover because he was injured, during the performance of his duty, by a hazard which that duty required him to confront. In its supplemental brief, Southland contended:

The failure of the 7–11 clerk to call for assistance is within the range of the anticipated risks of police work. A police officer responding to an emergency situation has

---

**3.** Inasmuch as the appellant does not allege that the employee's actions negligently created the need for his interference, this is not at issue in this case.

no reasonable expectation that people on the scene will assist them.... Under the facts of this case, the alleged refusal by the 7–11 clerk to call for police assistance does not present a negligent act outside the coverage of the fireman's rule.

■ To the contrary, that is exactly where Southland's responsibility may lie, *i.e.*, its refusal to act was an event in the nature of a "hidden danger"[4] that no police officer in this day and age could possibly anticipate.

As *Flowers* indicates, the "fireman's rule" does not preclude recovery for what might be termed "unanticipated risks" when the owner/occupant negligently fails to warn officers of pre-existing hidden dangers if the owner/occupant is aware of the danger and has the opportunity to warn the officer or fireman. The Court in *Flowers* illustrated this principle in a footnote listing cases from other jurisdictions that refused to apply the fireman's rule to negligence other than negligence that originated the officer's duty to become involved. *See Flowers*, 308 Md. at 448 n. 7, 520 A.2d 361. This strongly suggests that the "fireman's rule" is not an instrument to protect Southland if its employee acted negligently *after* Griffith assumed his role as an officer.

In *Soldano v. O'Daniels*, 141 Cal.App.3d 443, 453, 190 Cal.Rptr. 310 (1983), the California Court of Appeals held that an employee owed a duty to permit a call to the police or to place the call himself. There, a patron of a tavern

---

**4.** In *Cambridge Iron & Metal Co. v. Hartman*, 65 Md.App. 629, 501 A.2d 877 (1985), we held that when a fireman is injured by a risk that is "not quite normal and customary," he may recover. In that case, a property owner failed to alert firefighters that a highly explosive box of magnesium was on the scene. The alleged failure to notify the firefighters apparently led to their eventual injury. We held, as a matter of law, that the firemen did not "subject themselves to hidden dangers known to the owner but undisclosed to the firemen." *Id.* at 634, 501 A.2d 877. By parity of reasoning, a police officer protecting a store patron who was being assaulted would not have the prescience to anticipate that the store's proprietor would refuse to summon police assistance when so requested.

was threatened by an assailant. A good samaritan from the tavern proceeded to a neighboring restaurant owned by defendant and requested that defendant's employee call the police or allow himself to call. The employee refused both requests and, sometime later, the threatened patron was shot and killed.

The California court was quick to recognize that even in today's society where, unfortunately, encounters with the criminal element appear commonplace, "[m]any citizens simply 'don't want to get involved.'" *Id.* at 452, 190 Cal.Rptr. 310. Nevertheless, the court chose to create a limited duty binding the store owner to protect the safety of a member of the community, holding that to do less would be to abdicate its responsibility as the guardian of the common law. In reaching its conclusion, the court's reasoning was both cogent and instructive:

> We turn now to the concept of duty in a tort case. The Supreme Court has identified certain factors to be considered in determining whether a duty is owed to third persons. These factors include: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; cf. *Raymond v. Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8–9 [31 Cal.Rptr. 847].)

> We examine those factors in reference to this case. (1) The harm to the decedent was abundantly foreseeable; it was imminent. The employee was expressly told that a man had been threatened. The employee was a bartender. As such he knew it is foreseeable that some people who drink alcohol in the milieu of a bar setting are prone

to violence. (2) The certainty of decedent's injury is undisputed. (3) There is arguably a close connection between the employee's conduct and the injury; the patron wanted to use the phone to summon the police to intervene. The employee's refusal to allow the use of the phone prevented this anticipated intervention. If permitted to go to trial, the plaintiff may be able to show that the probable response time of the police would have been shorter than the time between the prohibited telephone call and the fatal shot. (4) The employee's conduct displayed a disregard for human life that can be characterized as morally wrong; he was callously indifferent to the possibility that Darrell Soldano would die as the result of his refusal to allow a person to use the telephone. Under the circumstances before us the bartender's burden was minimal and exposed him to no risk: all he had to do was allow the use of the telephone. It would have cost him or his employer nothing. It could have saved a life. (5) Finding a duty in these circumstances would promote a policy of preventing future harm. A citizen would not be required to summon the police but would be required, in circumstances such as those before us, not to impede another who has chosen to summon aid. (6) We have no information on the question of the availability, cost, and prevalence of insurance for the risk, but note that the liability which is sought to be imposed here is that of employee negligence, which is covered by many insurance policies. (7) The extent of the burden on the defendant was minimal, as noted.

*Id.* 141 Cal.App.3d at 450–51, 190 Cal.Rptr. 310 (footnote omitted).

## Maryland Public Policy

Aside from the fact that Maryland case law squarely supports a finding that the fireman's rule does not bar the appellant from seeking redress for his injuries, it is incumbent upon us to consider the policy implications if we were to hold otherwise. For one thing, the rule proposed by

Southland encourages the public to ignore the legitimate plea of an officer in trouble, even though, as noted elsewhere, the employee would not have been endangered by responding to the request. Additionally, Southland's position flies in the face of the State's demonstrated interest in affording all of its citizens rapid and effective police and fire protection when "the lives or property of its citizens are in imminent danger":

(a) The General Assembly recognizes the paramount importance of the safety and well-being of the citizens of Maryland and further recognizes that when the lives or property of its citizens are in imminent danger, timely and appropriate assistance must be rendered.

(b) Further, the General Assembly recognizes that such assistance is almost always summoned by telephone and that a multiplicity of emergency telephone numbers exist throughout the State and within any one county.

(c) The General Assembly is concerned that avoidable delays in reaching appropriate emergency aid are occurring to the jeopardy of life and property.

(d) The General Assembly acknowledges that the three digit number, 911, is a nationally recognized and applied telephone number which may be used to summon emergency aid and to eliminate delays caused by lack of familiarity with emergency numbers and by understandable confusion in circumstances of crisis.

(e) It is the purpose of this subtitle to establish the three digit number, 911, as the primary emergency telephone number for the State of Maryland and to provide for the orderly installation, maintenance, and operation of 911 systems within the State.

Md.Ann.Code art. 41, § 18–101 (1990).

We should not neglect an important opportunity to cultivate and improve Maryland law. This is not a situation where "the law has persistently refused to impose on a stranger the moral obligation of common humanity to go to the aid of another human being who is in danger, even if the other is in danger of losing his life." Prosser & Keaton,

*Torts* (5th ed. 1984). We are not imposing a "change" in existing law; instead, we are applying legal precedent to shape existing law in a manner that better reflects the spirit of the times and, with the same stroke, meets society's needs. The common law can and must grow in order to maintain its vitality. More than a century ago, the Supreme Court addressed this principle in a discussion of the role of the courts and the common law system:

> The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing society, and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the country.

*Hurtado v. California,* 110 U.S. 516, 530, 4 S.Ct. 111, 118, 28 L.Ed. 232 (1884) (cited in *Soldano, supra* 141 Cal.App.3d at 453, 190 Cal.Rptr. 310).

### Stare Decisis and the Common Law

The suggested duty, *i.e.,* to call 911 when there is no imminent risk of danger to the caller, does no violence to the doctrine of *stare decisis;* there is no *break* from precedent because *there is no precedent* which permits a bystander to refuse to call 911 when not exposed to imminent danger. Even if there were such an uncivilized and shocking principle, blind allegiance would invite disdain and disrespect for the courts. Francis H. Bohlen, in his article *The Moral Duty to Aid Others as a Basis of Tort Liability,* reveals the dangers of holding fast to obsolete standards:

> While courts of law should not yield to every passing current of popular thought, nonetheless, it appears inevitable that unless they adopt as legal those popular standards which they themselves, as men, regard as just and socially practicable, but which, as judges, they refuse to recognize solely because they are not the standards of the past of Brian, of Rolle, of Fineux, and of Coke; they will more and more lose their distinctive common law charac-

ter as part of the machinery whereby free men do justice among themselves.

Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability,* pt. II, 56 U.Pa.L.Rev. 316, 334–37 (1908) (quoted in *Soldano, supra,* at 448, 190 Cal.Rptr. 310).

Assuming, *arguendo,* the absence at common law of a duty to render aid under the circumstances *sub judice* because of the non-existence of a similar case, the declaration of Justices O'Connor, Kennedy, and Souter, speaking for the Supreme Court in the recent abortion case, *Planned Parenthood et al. v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), is instructive:

> [T]he obligation to follow precedent begins with necessity, and a contrary necessity marks its outer limit. [W]e recognize that no judicial system could do society's work if it eyed each issue afresh in every case that raised it.... At the other extreme, a different necessity would make itself felt if a prior judicial ruling should come to be seen so clearly as error that its enforcement was for that very reason doomed.

(Citations omitted.)

Here, we have no prior judicial ruling that conflicts with our holding in this case. Maryland first recognized the "fireman's rule" in a day and a time when there was no need for an emergency telephone system—a day and a time when the societal demands and needs were as different as the biplane of yesteryear is from the spaceship of today.[5]

■ Our holding today does not impose upon our citizenry a duty under *all* circumstances to come to the aid of a stranger in need. What we do announce, however, is this very narrow rule: when a police officer is in danger during the performance of his or her duties protecting patrons on the premises of a business, and requests, directly or indirectly, that an employee of the business who is not in the

---

**5.** *Steinwedel v. Hilbert,* 149 Md. 121, 131 A. 44 (1925).

path of the danger summon aid via the 911 system, then that employee has a legal obligation to do so promptly.

### c. Wilful or Wanton Conduct

Southland asserts that "there is no evidence in this record upon which the alleged conduct by the 7–11 employee can be characterized as wilful or wanton. The circumstances in this case do not rise to the level of actual knowledge of any harm, nor is there any evidence that the 7–11 employee intended to harm the appellant." In *Doehring v. Wagner,* 80 Md.App. 237, 562 A.2d 762 (1989), we defined the difference between wilful acts and wanton acts:

Wilful misconduct is performed with the actor's actual knowledge or with what the law deems the equivalent of actual knowledge of peril to be apprehended, coupled with a conscious failure to avert injury. A wanton act, by contrast, is performed with reckless indifference to its potential injurious consequences.

*Id.* at 246, 562 A.2d 762.

█ Southland is partially correct: the circumstances here do not indicate that the clerk had actual knowledge of any harm or that she intended to harm the appellant. On the other hand, viewing the potential evidence, as we must, in a light most favorable to Officer Griffith, the clerk was told that an officer was down and in need of help, yet she refused to summon aid. That could be viewed by the trier of the fact as "reckless indifference to its potentially injurious consequences." While we do hold that, under the circumstances *sub judice,* as a matter of law there was no "wilful misconduct," we cannot say as a matter of law that there was no evidence of "wanton misconduct." *See Flowers,* 308 Md. at 443, 520 A.2d 361. That is a matter to be determined by the trier of fact.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR

FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; APPELLEE TO PAY THE COSTS.

Dissenting opinion by BLOOM, J., in which CATHELL, J., joins.

BLOOM, Judge, dissenting.

The Court of Special Appeals is an error-correcting court, not a policy-making court. It is not for us to create new law to conform to our concepts of morality and rectitude. The Legislature may change the law by statute; the Court of Appeals may, by judicial fiat, alter the common law as it has adopted, created, or defined it. We, however, must apply the law as it is, not as we might like it to be.

I dissent from the majority opinion because I believe that it usurps the authority of the Court of Appeals and the Legislature to make such changes in the law as are deemed appropriate to suit the mores of the times. The majority, of course, denies that it has done so; it believes that its holding is consistent with the "fireman's rule" that has long been part of the law of this and many other states. But that belief is based upon faulty reasoning.

The entire panel is agreed that appellant's initial status on appellee's property was that of a business invitee. He was an off-duty police officer who went to the 7–11 as a customer. We are also agreed that before appellee's alleged breach of duty to him, he had assumed the role of a police officer performing the duties of his office—he had announced that he was a police officer and that his assailant was under arrest. His actions were in accordance with § 4.2.17 of the "Rules, Regulations, and Manual of Procedures" of the Anne Arundel County Police Department, which, at the time of this incident, provided:

> Members of the Department are held to be always on duty, although periodically relieved from their routine performance. They are subject at all times to orders from the proper authorities and to calls from citizens. The fact that they may be "off-duty" shall not be held as

relieving them from the responsibility of taking proper police action in any matter coming to their attention. Finally, we are all agreed that because appellant was on appellee's premises in the performance of his duties as a police officer when he was attacked and beaten by the three individual defendants, the "fireman's rule" applied.

It is a well established rule of law that the owner or occupant of premises owes no duty of care to a fireman or policeman who comes upon his property in the performance of his duties except to abstain from willful or wanton misconduct or entrapment. The rule was first applied in Maryland in *Steinwedel v. Hilbert,* 149 Md. 121, 131 A. 44 (1925), involving a fireman who fell down an open elevator shaft while fighting a fire. Although called the fireman's rule, it is equally applicable to policemen. *See Sherman v. Suburban Trust Co.,* 282 Md. 238, 384 A.2d 76 (1978), in which the Court explicated the rule as being based upon principles of premises liability law. A fireman or policeman entering premises in the performance of his duty was deemed to be a bare licensee, who must take the property as he finds it. The owner or occupant of land owes no duty to a licensee except, after becoming aware of the licensee's presence, the licensor must not willfully injure or entrap him. 282 Md. at 241–43, 384 A.2d 76.

In the recent case of *Flowers v. Rock Creek Terrace,* 308 Md. 432, 520 A.2d 361 (1987), the Court continued to recognize the rule but held that it is based upon public policy grounds rather than on principles of premises liability law.

We agree that the fireman's rule is best explained by public policy. As pointed out in *Aravanis v. Eisenberg* [237 Md. 242, 206 A.2d 148 (1965) ], *supra,* it is the nature of the firefighting occupation that limits a fireman's ability to recover in tort for work-related injuries. Instead of continuing to use a rationale based on the law of premises liability, we hold that, as a matter of public policy, firemen and police officers generally cannot recover for injuries attributable to the negligence that requires their assistance. This public policy is based on a relation-

ship between firemen and policemen and the public that calls on these safety officers specifically to confront certain hazards on behalf of the public.

. . . . .

We reiterate, however, that firemen and policemen are not barred from recovery for all improper conduct. Negligent acts not protected by the fireman's rule may include failure to warn the firemen of pre-existing hidden dangers where there was knowledge of the danger and an opportunity to warn. They also may include acts which occur subsequent to the safety officer's arrival on the scene and which are outside of his anticipated occupational hazards. As indicated by this Court in *Aravanis*, the fireman's rule should not apply "when the fireman sustains injuries after the initial period of his anticipated occupational risk, or from perils not reasonably foreseeable as part of that risk." In these situations a fireman or policeman is owed a duty of due care.

*Id.* 308 Md. at 447–48, 520 A.2d 361 (citations omitted).

Since the rule is based upon public policy grounds, it is immaterial that appellant was already on the premises, as a patron, when the incident that required him to act in the capacity of a police officer arose. He was injured in the performance of his duty; the hazard he encountered was one his duty required him to confront. There is no suggestion that appellee did anything to injure or entrap him, or failed to warn him of any hidden or unexpected peril. Nor, I maintain, was appellee responsible for anything that occurred outside of appellant's anticipated hazards.

The theory on which the majority bases its holding is that appellee's employee's refusal to call 911 when requested to do so was "an event in the nature of a 'hidden danger,'" an unanticipated risk; an act of negligence *after* appellant assumed the role of a police officer in the performance of his official duties. That theory defies all logic. Appellee's employee's refusal to call for assistance could not be a hidden danger, an unanticipated risk, an "act of negli-

gence," *i.e.*, a negligent omission, unless there was a *duty* to act that appellant had a right to rely on. Obviously, unless one has a duty to summons help for a police officer in trouble when requested to do so, the failure to call for help can hardly be deemed to be an unexpected risk or hazard of the policeman's job. It is an exercise in circuitous reasoning to conclude that such a duty arises because the officer is relying on it, because the officer cannot rely on someone else performing a duty unless the duty exists independent of such reliance.

There is unquestionably a *moral* obligation on the part of one human being to come to the aid of another in peril. And the obligation is all the stronger when the aid sought involves nothing more than picking up a telephone and dialing 911 to summon others who are trained and equipped to protect life and property. But neither the common law nor any statute of this state imposes civil liability upon one who declines to perform even a minimal task to help a fellow human being in danger or distress. If, therefore, I see my neighbor being mugged or his house on fire, I am morally obligated to call the police or the fire department, since I can do that with little effort and no danger to myself. If I choose not to do so, however; if I simply close my eyes, turn my back, do nothing, I shall probably suffer the opprobrium my conduct merits, but until now, under the law of this state, I could not be held legally accountable for the harm sustained by my neighbor.

The majority relies heavily on *Soldano v. O'Daniels*, 141 Cal.App.3d 443, 190 Cal.Rptr. 310 (1983). But not even the California intermediate appellate court, which is noted for innovative judicial activism, went so far as the majority has gone in the case *sub judice*. In *Soldano*, a good Samaritan, observing someone attack a patron in a tavern, ran across the street to a restaurant that was open for business and requested an employee of the restaurant (a bartender) either to call the police or let the good Samaritan use the telephone to call the police. The bartender refused to do either. The tavern patron who was being attacked was shot

and killed. The restaurant owner was held liable, not because his bartender did nothing, that is, refused to dial 911 himself, but because he refused to let the good Samaritan use the telephone to call the police, as is apparent from the opening sentence of Judge Andreen's opinion:

> Does a business establishment incur liability for wrongful death if it denies use of its telephone to a good samaritan who explains an emergency situation occurring without and wishes to call the police?

The *Soldano* Court expressly recognized that the law has consistently refused "to recognize the moral obligation of one to aid another when he is in peril and when such aid may be given without danger and at little cost in effort." The Court relied on § 327 of the Restatement, 2d, Torts, dealing with prevention of assistance by third persons, which provides that if one knows that a third person is ready to give aid to another and negligently prevents the third person from doing so, he is subject to liability for harm caused by the absence of the aid. The Restatement explains that preventing a third person from rendering aid to another can take many forms, including preventing the third person from using a thing which the third person is using or attempting to use in giving aid. In the case *sub judice*, there was no refusal to let appellant's son use the telephone; the allegation is that appellee's clerk did not make the call when requested to do so.

The majority also stresses the creation of the 911 telephone system to make it easier for people in need of police, fire, ambulance, or other emergency assistance to summon it. But there is nothing in the law establishing that system to suggest an intent to create tort liability for failing to use it.

My disagreement with the majority opinion goes beyond what I believe to be a usurpation of authority to create a new basis for tort liability. It extends to the imposition of that liability on the appellee on the basis of *respondeat superior.*

Although the majority opinion stresses the moral obligation each of us owes to come to the aid of someone in peril, particularly if aid can be rendered safely and with little effort, it does not impose liability on appellee on that basis. To do so would logically extend the duty and the concomitant liability for failure to perform the duty to *any* person who may be requested to call 911 to summon policemen, firemen, or medical personnel in an emergency. That far the majority is unwilling or admittedly unable to go. Furthermore, a duty and a liability created on that basis would logically be confined to the morally delinquent individual. Why should an employer be responsible for an employee's breach of a highly personal duty founded on a moral responsibility every human being owes to his fellow man? In this case, however, appellant seeks to hold the employer liable for the default of the employee; the employee obviously possessed of shallow pockets, is not even named as a defendant.

In order to keep from going too far afield in creating a new tort liability, the majority tries to attach that liability to an exception to the fireman's rule. But the fireman's rule is a rule of premises liability law. It relieves the owner or occupant of premises from liability for injuries sustained by a fireman or a policeman while performing his job on those premises, and the exceptions to the rule, referred to in *Flowers* and relied upon by the majority, involve unknown, unexpected, and hidden dangers, risks, and hazards associated with the premises. The refusal of a store clerk to dial three numbers on a telephone to summon police assistance is a personal delinquency that does nothing to make the premises more hazardous than the policeman on the scene has reason to anticipate.

Under the fireman's rule, since appellant was injured in the performance of his police duties, the fact that those duties were being performed and the injuries occurred on appellee's premises create no liability for appellee. Being beaten by three thugs whom he undertook to subdue and arrest was a known risk and hazard of appellant's employ-

ment, and that risk was not enhanced or exacerbated by the alleged refusal by appellee's employment to call for police assistance when requested to do so. Nor was the refusal to call the police itself an unforeseeable hazard associated with the premises that came within any exception to the fireman's rule. The grant of summary judgment in favor of appellee was eminently correct and should be affirmed.

Judge Cathell authorizes me to state that he fully concurs in this opinion.