29 A.3d 1038

James E. TROXEL, 3D

v.

IGUANA CANTINA, LLC, et al.

No. 820, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Oct. 3, 2011.

478

Charles M. Kerr (Kerr McDonald, LLP, on the brief) Baltimore, MD, for appellant.

James R. Andersen (Rollins, Smalkin, Richards & Mackie LLC, on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., KEHOE and CRYSTAL DIXON MITTELSTAEDT (Specially Assigned), JJ.

KEHOE, J.

This case arises out of a claim filed by appellant, James E. Troxel, in the Circuit Court for Baltimore City in which he sought damages for injuries he allegedly received on the dance floor of a nightclub called Iguana Cantina located near the Inner Harbor in Baltimore City. Troxel sued the following defendants: (1) Iguana Cantina, LLC, the entity that operated the club, (2) Timothy S. Bennett, the club's manager, (3) Lockwood Associates, LLC, the club's landlord, (4) Parkway Corporation, the managing entity for Lockwood Associates, and (5) the senior principals of Parkway Corporation: Joseph S. Zuritsky (Chairman and Chief Executive Officer), Robert A. Zuritsky (President and Chief Operating Officer) and Richard Elsworth (General Manager). The circuit court granted summary judgment in favor of the defendants. Troxel filed this appeal, presenting the following questions, which we have reordered and reworded below:

1. Did the trial court err in granting appellees' summary judgment motion on the ground that Troxel's cause of action sought damages against the appellees on a theory of "dram shop" liability?

2. Did the trial court err in granting appellees' summary judgment motion on the ground that Troxel failed to present any evidence to sustain a negligence claim?

We conclude that the trial court erred in granting appellees' motion for summary judgment. Appellant's cause of action exists independently of a claim for dram shop liability and the evidence of negligence is sufficient to survive a motion for summary judgment. We reverse and remand to the circuit court for proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Complaint*

Troxel alleges that appellees maintained "extremely dangerous conditions at Defendant Iguana's premises which put patrons of Defendant Iguana at risk of physical harm." Troxel further asserts that "Plaintiff would not have suffered the

beating he experienced on September 25–26, 2008" if it were not for "Defendant Iguana's failure to provide security for protection of its customers and its failure to use reasonable efforts to control its patrons...." Troxel concludes that "Defendants breached the duty of care that they owed to patrons of Defendant Iguana, and that breach of duty by the Defendant is a substantial and proximate cause of the injuries and damages that Plaintiff suffered at the Iguana Cantina in the early morning of September 26, 2008."

### B. The Incident at Iguana Cantina on the Morning of September 26, 2008

The physical altercation that gave rise to this lawsuit occurred on the morning of September 26, 2008 at Iguana Cantina. At the time, the club was owned and operated by Iguana Cantina, LLC and under a lease with Lockwood Associates, LLC. Timothy S. Bennett was the general manager of the nightclub.

Every Thursday night, including the night of this altercation, Iguana Cantina hosted a "college night" promotion that permitted adults between the ages of 18 and 21 to attend the nightclub. Troxel, 20 years old at the time, attended that evening, arriving at approximately 10:00 pm on September 25, 2008. At approximately 12:30 am on the following morning, he was involved in an altercation with several unidentified males on the dance floor. Troxel has no recollection of the incident, but he alleges, based on deposition testimony from other patrons at the bar, that three or more young males punched and beat him to the floor and continued kicking him into unconsciousness. When Iguana Cantina security personnel saw Troxel's body on the floor, they carried him out of the club.

Appellees present a different version of the altercation. Appellees assert that the physical altercation started because "Troxel, intoxicated and apparently unprovoked, pushed a woman named Marie Zoscak to the ground in the area of the dance floor." Appellees contend that Troxel was only punched once or twice and kicked several times while on the ground.

The altercation, according to appellees, lasted no more than a minute.

In either scenario, it is undisputed that Baltimore City police stationed outside Iguana Cantina soon came to Troxel's aid and called for an emergency medical team. Troxel was initially treated at Harbor Hospital but was soon transferred to the University of Maryland Shock Trauma Center. Troxel alleges that, as a result of the beating, he suffers from permanent physical and neurological injuries.

### C. Iguana Cantina's "College Night" Promotion and its Relation to Violence

In order to establish a potential duty on behalf of Iguana Cantina to protect him against violence, Troxel scrutinizes the "college nights" that were hosted by Iguana Cantina. On these "college nights," which were first held at least as early as May 2005, patrons were charged a flat fee of $12 to enter the club. Anyone 21 years of age or older was given a red cup and a wrist band, and anyone under 21 years of age was given a clear cup. The flat fee gave those patrons with red cups and wrist bands access to alcoholic beverages and unlimited refills from the bar. Patrons with clear cups were entitled to unlimited nonalcoholic drinks.

Before the night of September 25, 2008, Iguana Cantina had a history of violent incidents occurring within its premises. According to records from the Baltimore Police Department, in 2006, there were reports of eight aggravated assaults, one robbery and one potential rape, all of which occurred within the premises of Iguana Cantina. In 2007, Iguana Cantina saw a sharp decline in reports of violent incidents within its premises (only two incidents were reported). This decrease in reported violence corresponded with a promise made by David Adams—a representative of Iguana Cantina who described his duties as training the security staff and coordinating with the police department on security measures—to the Board of Liquor License Commissioners for Baltimore City (the "Baltimore City Liquor Board") that it would no longer hold "college night" promotions as of August 17, 2006 (described

*infra* ). Iguana Cantina did indeed suspend its "college night" promotions for a period of time following August 17, 2006. This hiatus was brief, however, and Iguana Cantina resumed the "college night" promotions by the end of 2007. Around the same time, instances of reported violence at Iguana Cantina increased. During the twelve months preceding the beating of Troxel in September 2008, police reports documented four aggravated assaults, one robbery, one assault on a police officer, and one incident where a police officer was required to use his taser to subdue a suspect. Again, all of these incidents occurred within the premises of Iguana Cantina.

In addition to police reports, Troxel introduced evidence of violence at Iguana Cantina through affidavits and deposition testimony. Zachary Belcher, a former Iguana Cantina security guard who worked at the nightclub from March 2005 through June 2008, said in his affidavit that in his experience as a security guard at Iguana Cantina:

> More incidents of violence occurred ... on college nights because of the large crowds and the larger [numbers] of underage patrons who were present and who were obtaining alcoholic beverages while in Iguana. The result was more intoxicated young people who started fights and got ejected, and it was common knowledge among the security guards and Iguana's management that there was more violence in Iguana on college nights. My own experience was that on college nights there was never less than one fight per night, and I experienced up to five fights per night on college nights.

According to Belcher, Timothy Bennet, the club's manager, arranged for the marketing of Iguana Cantina's 18–and–older "college night" promotions on local Baltimore-area college and university campuses. Belcher stated that, during those college-night promotions:

> [A] lot of underage patrons were ... able to obtain alcoholic beverages inside Iguana. Underage patrons got wrist bands from 21–year old and older patrons as they left the club. They would also steal wrist bands by slipping them

off the arms of older patrons in the darkness and confusion of the crowds. Some underage patrons simply drank alcohol out of older friend's cups or poured alcoholic beverages from the older patron's red cup into their clear cups. It was common knowledge among my fellow employees and Iguana Cantina's management that underage drinking was occurring on college nights.

Similarly, Iguana Cantina security guard Charles E. Shannon, Jr. testified at his deposition that there were probably more fights that occurred on a "college night" than any other weekend night because of the younger people drinking. Another bar employee, Joshua W. Jones, testified at his deposition that he would normally see one fight per night at Iguana Cantina.

### D. Iguana Cantina's History with the Baltimore City Liquor Board

From time to time Iguana Cantina was cited for violations of Maryland's state liquor law. Troxel alleges that these violations are significant because they underscore the relationship between violence at Iguana Cantina and the occurrence of the club's "college nights." For example, on August 25, 2005, the Baltimore City Liquor Board heard charges brought against Iguana Cantina's liquor licensees accusing Iguana Cantina of allowing customers under 21 years of age to consume or possess alcoholic beverages on Iguana Cantina's premises at its "college night" promotions. The Board found Iguana Cantina guilty and fined it $2500 for two violations of a provision of Maryland's Alcoholic Beverages Article, namely MD.CODE ANN. Art. 2B § 12–108(d) (1957, 2005 Repl.Vol.). The Board's decision was eventually appealed to this Court. We affirmed the Board's determination that Iguana Cantina permitted underage consumption of alcohol by failing to prevent it. Adams v. Bd. of Liquor License Comm'rs, Slip Op., No. 67, September Term, 2006 (filed January 16, 2007).

On July 13, 2006, the Baltimore City Liquor Board again heard charges brought against the licensees of Iguana Cantina for once again violating section 12–108(d) by permitting per-

sons under 21 years of age to consume alcoholic beverages at its "college night." At the hearing, David Adams, a representative of Iguana Cantina involved in implementing Iguana Cantina's security measures, testified on behalf of the nightclub. Adams spoke about the security difficulties involved in mixing an 18 to 20 year old crowd with a 21 and older crowd. Adams stated that security personnel had to be very diligent in preventing persons under 21 years old from beating the system. Adams admitted that he had grown tired of people trying to "beat my system" and that Iguana Cantina would be abandoning the "college night" promotions. Adams said "we will be 21 and over. I can't take any more . . . Iguana Cantina will be 21 and over, with their ID procedures videotaped, and, hopefully, I'll never have to come back before the liquor board." The Board found Iguana Cantina guilty of violating § 12–108(d) but it only imposed a fine of $1,000, with its Chairman, Mark S. Fosler, telling Iguana Cantina that: "We mitigated that fine based on the fact that the licensee has agreed to stop doing under–21 promotions and having under–21 consumers and patrons as of August 17th. And we're glad that that's going to happen."

Despite the representation from Adams, Iguana Cantina resumed its "college night" promotion by the end of 2007.

### E. The Summary Judgment Proceeding

On March 2, 2010, Iguana Cantina and Timothy Bennett filed a motion for summary judgment. The motion asserted that Troxel's theory of the case "is tantamount to imposing dram shop liability on the operators of nightclubs in Maryland" and that "[s]uch liability simply does not exist in the state of Maryland." As asserted by Iguana Cantina and Bennett, Troxel's argument must also fail because there was "no evidence empirical or otherwise presented that hosting college night promotions substantially increase[d] the risk of injuries to other patrons." Ultimately, the motion argued that "[t]he proximate cause of Plaintiff's injuries was not the fact that Defendant Iguana Cantina held a college night event on the evening of the occurrence and permitted entrance to the

nightclub by adults between the ages of eighteen and twenty-one, but the fact that several young men whose identities and ages are not known and whose consumption of alcohol is unknown assaulted the Plaintiff shortly after he shoved a young woman to the ground." As a result, as posited by Iguana Cantina and Bennett, "[t]hese Defendants have no responsibility for the conduct of the assailants" and "judgment as a matter of law must be entered in favor of Defendants . . . ."

The circuit court conducted a hearing on the motion for summary judgment on May 10, 2010.[1] On June 16, 2010, the trial court issued a memorandum opinion and order granting appellees' motion for summary judgment. The court concluded that Troxel's claim was "clearly an attempt to assert 'Dram Shop' liability and no such duty of 'Dram Shop' liability exists under Maryland law." In addition, the circuit court concluded that there was simply no evidence to support a legal duty, a breach of that duty, or causation. The circuit court stated:

> Though the Plaintiff disagrees, the Defendants Iguana and Bennett could not have known in advance that their hosting of college night would result in a physical altercation involving the Plaintiff or any other patron. There is no evidence that the Defendants could have controlled this dangerous condition or situation. Certainly, the fight which occurred was simply not the type of event or occurrence that could have been reasonably foreseeable. There is no evidence that the unknown persons who assaulted the Plaintiff had been drinking or the assailants were under 21 years old. This also stands as a bald assertion by the Plaintiff.

> Even in the light most favorable to the Plaintiff, there is nothing to support the contention that the Defendants owed the Plaintiff a duty.

\* \* \* \* \* \*

---

1. At the summary judgment hearing on May 10, 2010, the remaining defendants, Lockwood Associates, LLC, Parkway Corporations, Joseph Zuritsky, Robert A. Zuritsky and Richard Elsworth, by their counsel, verbally requested permission to join and adopt Iguana Cantina and Bennett's motion for summary judgment. Permission was granted.

Since there is no evidence that Defendants Iguana or Bennett breached any duty owed to Plaintiff James Troxel and there is no evidence that any such breach proximately caused Plaintiff Troxel's injuries, there can be no legal claim to sustain.

Troxel filed a timely notice of appeal to this Court.

## STANDARD OF REVIEW

"We review a trial court's decision on a motion for summary judgment *de novo.*" *Harford County v. Saks Fifth Ave. Distrib. Co.,* 399 Md. 73, 82, 923 A.2d 1 (2007). We determine whether the trial court conformed to Rule 2–501(e), which provides that "the court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Therefore, in reviewing the circuit court's grant of summary judgment, we determine whether a dispute of material fact indeed exists, and whether the trial court was legally correct. *Lombardi v. Montgomery County,* 108 Md.App. 695, 673 A.2d 762 (1996). "Furthermore, when reviewing a trial court's order for summary judgment, we construe the facts properly before the court as well as reasonable inferences that may be drawn from them in the light most favorable to the non-moving party." *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship,* 375 Md. 522, 534–35, 826 A.2d 443 (2003).

In addition, where the trial court relies on alternative independent grounds in reaching its decision, we must "determine that all of the grounds upon which the court relied were improper." *Monumental Life Ins. Co. v. United States Fidelity & Guar. Co.,* 94 Md.App. 505, 523, 617 A.2d 1163 (1993).

## DISCUSSION

The primary issue in this case is whether appellees, as owners, proprietors and managers of Iguana Cantina, can be held liable for the injuries inflicted by unknown third parties against Troxel, a business-invitee of the nightclub. Troxel

argues that, if viewed in the correct light, this case is a premises liability claim and not a dram shop claim, and the determination of whether Iguana Cantina was negligent in this context should be submitted to the jury. Appellees' principal arguments are that Troxel's claim should be rejected because his "argument is tantamount to asserting that . . . dram shop liability should be imposed . . . in the state of Maryland" and that, even if Troxel could assert a valid cause of action, "his claims would fail because Appellant has not produced any evidence that this duty not to hold 'college nights' was a proximate cause of his injuries." We agree with Troxel. We discuss in three parts.

In Part I of our analysis we discuss the differences between dram shop liability and premises liability, and explain why this case should be analyzed in the latter context. In Part II, we break down the elements of a premises liability claim (duty, breach, proximate cause, injury) and determine whether Troxel has presented facts sufficient to survive a motion for summary judgment. Finally, in Part III, we address a peripheral argument of appellees, that this Court should not consider certain documents tending to show that Iguana Cantina had knowledge of prior violent incidents occurring within its premises.

### I. Dram Shop Liability v. Premises Liability

There are two distinct causes of action that a plaintiff can bring to impose liability on a business for injuries sustained on or off the establishment's premises: a dram shop liability claim and a premises liability claim. Dram shop liability provides relief to plaintiffs who are injured as a result of the establishment's sale of alcohol. This type of liability is not recognized as a valid cause of action in Maryland. *Felder v. Butler*, 292 Md. 174, 183–84, 438 A.2d 494 (1981); *Veytsman v. New York Palace, Inc.*, 170 Md.App. 104, 123, 906 A.2d 1028 (2006). Premises liability provides relief to plaintiffs who are subjected to dangerous conditions on an establishment's premises. This type of liability is recognized in Maryland and it exists whether alcohol is involved or not. The distinction

between these two causes of action is critical in this case. We discuss each more fully.[2]

A dram shop act is "[a] statute allowing a plaintiff to recover damages from a commercial seller of alcoholic beverages for the plaintiff's injuries caused by a customer's intoxication." BLACK'S LAW DICTIONARY 531 (8th ed.2007). More specifically:

> Dram shop acts are a departure from the common law rule that the act of drinking, and not the service of liquor, was the cause of any resulting injury. Under a dram shop act, a person injured by an adult who was served while intoxicated, or by a minor who was served alcohol, whether intoxicated or not, has a cause of action against the tavern that served the alcohol.

* * * * * *

The stated purpose behind many dram shop acts is to provide innocent parties with a cause of action against those persons who are in the best position to prevent the tortfeasor's intoxication, namely, the providers of the alcohol. By placing the burden of economic loss on the vendors of alcohol, the dram shop act provides an extremely effective incentive for those vendors to do everything in their power to avoid making illegal sales, and at the same time it

---

**2.** Dram shop liability and premises liability are distinct but not mutually exclusive concepts. In a state that recognizes dram shop liability, a person who is injured on the premises of a tavern may, depending on the facts, be able to recover under either or both theories. For example, as discussed *infra*, a plaintiff may recover under a dram shop theory if the plaintiff is injured on the premises of a tavern as a result of the tavern's sale of alcohol to a noticeably intoxicated or underage patron. If there is also a history of similar violent conduct on the premises (again, as described *infra* ), then a plaintiff may have a cause of action based on premises liability. *See* Joan Teshima, *Tavernkeeper's Liability to Patron for Third Person's Assault,* 43 A.L.R.4th 281, *2a (2011) (explaining that many patrons who receive injuries on the premises of a tavern may "base their suits on the tavernkeeper's negligence in failing to supervise the premises [premises liability], rather than, or in addition to, the tavernkeeper's sale of intoxicating liquor [dram shop liability].").

provides a remedy to members of the public who are injured as a result of illegal liquor sales.

JAMES F. MOSHER, 1 LIQUOR LAW LIABILITY § 2.01 at 2–2 and 2–3 (2010). Dram shop liability, then, holds tavern keepers liable for personal injuries based on the tavern keeper's illegal *sale* of intoxicating liquor. Potential liability attaches once the illegal transaction is made and the alcohol changes hands. Generally, a statutory dram shop cause of action requires: (1) a server of intoxicating beverages; (2) a recipient of alcohol who is either an intoxicated person or a minor; and (3) an injury which is proximately caused by the intoxication. *Id.*

█ The second type of claim that a plaintiff can bring against a business owner is a premises liability claim. This cause of action is based on common law principles of negligence and derives from an establishment's lack of supervision, care, or control of the premises. RESTATEMENT (SECOND) OF TORTS § 344 (1965). "The rule today is usually generalized to include all landowners who open their land to the public for business and to require them to use reasonable care even to protect against criminal acts of third persons." DAN B. DOBBS, 2 THE LAW OF TORTS § 324 at 876 (2001). Under this type of theory, a tavern owner will have a duty to protect his patrons, and thus be liable for negligence, if: " '(1) the [owner] controlled [a] dangerous or defective condition; (2) the [owner] had knowledge or should have had knowledge of the injury causing condition; and (3) the harm suffered was a foreseeable result of that condition.' " *Veytsman,* 170 Md.App. at 116, 906 A.2d 1028 (quoting *Hemmings,* 375 Md. at 537, 826 A.2d 443).

The distinction between a dram shop claim and a premises liability claim was considered by the Supreme Court of Delaware in *DiOssi v. Maroney,* 548 A.2d 1361 (1988). The plaintiff, an employee of a parking valet service, was struck by an automobile operated by an intoxicated guest at a debutante party hosted at the defendants' home. "[T]he plaintiff, in resisting summary judgment, argued that his claim against the [defendants] was not based merely on the illegal provision of alcoholic beverages to minors but on the [defendants']

failure to protect him from a dangerous condition on their property." *Id.* at 1363. The trial court granted defendants' motion for summary judgment, concluding that "there is no cause of action against a person who serves alcoholic beverages to another who thereafter commits a tort." *Id.* The Supreme Court of Delaware reversed. While the Supreme Court agreed with the trial court that "intoxication appears to be a contributing cause to the personal injuries which are alleged," and that "a private right of action premised upon 'Dram Shop' principles should not be judicially created" in Delaware, the Supreme Court stated that this does not "foreclose[ ] the liability of everyone who serves alcohol to an intoxicated person." *Id.* at 1364. "Under settled Delaware law, the [defendants] owed the plaintiff a duty to exercise reasonable care to protect him from foreseeable dangers that he might encounter while on the premises." The Supreme Court reasoned as follows:

> The facts of this case permit [a theory of liability] which arises from the common law duty of a property owner to a business invitee. In our view, the focus of liability in this case is on the exposure of a business invitee to a dangerous activity which the property owner permitted to exist on his land. The fact that the activity arose out of the furnishing of intoxicating liquor does not preclude the fixing of liability, notwithstanding the limitation of such claims against commercial dispensers.

*Id.* at 1365.

In his amended complaint, Troxel asserts a premises liability claim. The complaint alleges (1) that appellees "retained control" of "the extremely dangerous conditions at Defendant Iguana's premises," (2) that appellees were "on notice of Defendant Iguana's entertainment-tavern business model and its reliance on 18 to 21 year old 'college-night' promotions, and the danger that business model posed for patrons of Defendant Iguana," and (3) that "the damages [Troxel] suffered . . . were entirely foreseeable." As a matter of law, this type of claim may attach regardless of whether the assailants purchased or consumed alcohol on appellees' prem-

ises. The gravamen of the cause of action is that the injury resulted from appellees' failure to protect patrons from a dangerous condition, and not from the furnishing of alcohol. Indeed, in Maryland, cases that involve an injury to a business invitee on the premises of a restaurant, hotel, or bar are routinely analyzed in the premises liability context. *See Veytsman,* 170 Md.App. 104, 123, 906 A.2d 1028 (2006); *Corinaldi v. Columbia Courtyard, Inc.,* 162 Md.App. 207, 218, 873 A.2d 483 (2005); *Moore v. Jimel, Inc.,* 147 Md.App. 336, 809 A.2d 10 (2002). Appellees are incorrect to characterize Troxel's claim as an assertion of dram shop liability. The circuit court in this case should have analyzed these facts using a premises liability framework.

## II. THE NEGLIGENCE CLAIM

We now turn to whether Troxel presented sufficient evidence, when construing the facts and reasonable inferences drawn from the facts in the light most favorable to Troxel, to sustain a premises liability negligence claim. A properly pleaded claim of negligence includes four elements. The plaintiff must show: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the defendant's breach of the duty proximately caused the loss or injury suffered by the plaintiff, and (4) that the plaintiff suffered actual loss or injury.[3] *Corinaldi,* 162 Md.App. at 218, 873 A.2d 483. "Whether a plaintiff has presented sufficient evidence of the elements of negligence is generally a question for the fact finder, but the existence of a legal duty is a question of law to be decided by the court." *Id.*

We must first determine as a matter of law whether Iguana Cantina owed a duty to Troxel. If a duty exists, we must then decide whether Troxel presented sufficient factual evidence on his negligence claim to survive a motion for summary judgment.

---

**3.** Appellees do not dispute that Troxel suffered actual loss or injury.

## A. Duty

Duty in a negligence claim is an obligation to conform to a particular standard of conduct toward another. *Veytsman,* 170 Md.App. at 113, 906 A.2d 1028. The duty may arise from a "special relationship" between the parties. *Id.* at 114, 906 A.2d 1028. A special relationship between a business owner and patron, giving rise to a duty to exercise due care to protect the patron, generally arises when three circumstances are present: "(1) the owner controlled [a] dangerous or defective condition; (2) the owner had knowledge or should have had knowledge of the injury causing condition; and (3) the harm suffered was a foreseeable result of that condition." *Id.* at 115–16, 906 A.2d 1028.

The trial court in this case decided that "there is nothing to support the contention that the Defendants owed the Plaintiff a duty." We disagree.

The landmark decision in Maryland on whether a duty exists in a premises liability case is set out in *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976). Scott was shot and killed by an unknown assailant in the underground parking garage in his apartment building. *Id.* at 162, 359 A.2d 548. In the months immediately preceding Scott's death, records from the Baltimore City Police Department indicated that numerous violent incidents were reported to have been committed on or near the apartment premises. *Id.* at 164, 359 A.2d 548. Scott's estate brought a wrongful death action against the apartment complex claiming that it "had breached a duty owed to Scott as one of [its] tenants to protect him from criminal acts of third parties committed in common areas within [its] control, and that the breach of duty proximately caused Scott's death." *Id.* at 161, 359 A.2d 548. The Court of Appeals, called upon to answer several questions certified to it by the United States District Court of Maryland, stated that, as a general rule, "[i]f the landlord knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take *reasonable* measures, in view of the existing circumstances, to eliminate the conditions

contributing to the criminal activity." *Id.* at 169, 359 A.2d 548 (emphasis in original).

In *Corinaldi,* 162 Md.App. 207, 873 A.2d 483, we discussed the teachings of *Scott* in setting out three general theories on which a landowner may be held liable when someone is injured by third party criminal activities on the premises. Under the first theory, a duty is imposed on the landowner to eliminate conditions that contribute to criminal activity if the landowner had prior knowledge of *similar criminal activity*—evidenced by past events—occurring on the premises. *Id.* at 223, 873 A.2d 483. In the second scenario, a duty is imposed on the landowner to prevent criminal conduct of a specific assailant if the landowner is aware of the violent tendencies of *that particular assailant. Id.* at 224, 873 A.2d 483. The third category involves the imposition of a duty on a landowner if the landowner had knowledge of events *occurring immediately before* the actual criminal activity that made imminent harm foreseeable. *Id.*

Troxel asserts that the facts of this case fit into the first of the three categories discussed in *Corinaldi.* Indeed, in this case, like the first category of landowner liability depicted in *Corinaldi,* "[t]he asserted duty [is] based on knowledge of prior similar incidents" and "the plaintiff's claim [is] based on an asserted duty to eliminate conditions that contributed to the criminal activity, such as providing security personnel, lighting, locks, and the like." *Id.* at 223, 873 A.2d 483.

A similar factual scenario—where a plaintiff attempted to hold a bar liable for criminal activity that occurred on the premises (again, the first of the three categories discussed in *Corinaldi* )—was before this Court in *Moore v. Jimel, Inc.,* 147 Md.App. 336, 809 A.2d 10 (2002). That case involved a woman who was assaulted in the restroom of a bar in the Fells Point neighborhood of Baltimore City. *Id.* at 337, 809 A.2d 10. The woman sued the bar for "negligently having failed to provide the security owed to her as a business invitee." *Id.* The Court reiterated the rule set out in *Scott,* that "when it can be illustrated that the landlord had knowledge of in-

creased criminal activity on the premises, a duty is imposed on the landlord to undertake reasonable measures to keep the premises secure." *Id.* at 348, 809 A.2d 10. In *Moore*, however, the woman failed to produce any evidence of prior criminal activity. The Court concluded that "[b]ecause there was no evidence of any prior crime having been committed against a customer on the premises, there was no foreseeability of risk so as to create a special duty in that regard." *Id.* at 349, 809 A.2d 10. The Court affirmed the granting of summary judgment in favor of the bar owner. *Id.*

■■■ Viewing the record as a whole and giving Troxel the benefit of inferences that can be reasonably drawn from the facts presented, the evidence of prior violence that was missing in *Moore* is present in this case. In 2006, the Baltimore Police Department reported eight aggravated assaults, one robbery and one potential rape that occurred within the premises of Iguana Cantina. During the twelve months leading up to September 2008, the Baltimore Police Department again reported four aggravated assaults, one robbery, and two assaults on police officers, all occurring inside Iguana Cantina. Zachary Belcher, a former Iguana Cantina security guard who worked at the nightclub from March 2005 through June 2008, stated in an affidavit that in his experience as a security guard at Iguana Cantina, he "experienced up to five fights per night on college nights." Another Iguana Cantina security guard, Charles E. Shannon, Jr., testified at his deposition that there were probably more fights that occurred on a "college night" than any other night.

A fact finder could reasonably infer from this evidence that appellees knew or should have known about a dangerous condition within its premises and therefore had an obligation to take reasonable steps to eliminate the dangerous condition under its control. Iguana Cantina, under the first theory of recovery outlined in *Corinaldi*, had a legal duty to take reasonable measures to provide a safe environment for its patrons because of the history of violent incidents that oc-

curred on its premises in the years and months leading up to September 25, 2008.

This result is not unique to Maryland. A plethora of federal and state cases have found tavern keepers liable for personal injuries inflicted on patrons by the intentional acts of third persons on or about the premises. *See generally* Teshima, *supra,* 43 A.L.R.4th 281 (collecting cases in which the plaintiffs brought their lawsuits as premises liability claims instead of—or, in addition to—dram shop claims). In most cases, courts impose a duty only when dangerous conditions or violent actions are deemed reasonably foreseeable. For example, if a club owner generally tolerates disorderly conduct or fails to provide adequate staff to police the premises, courts often view violent attacks as foreseeable results of inherently dangerous environments. *See, e.g. Allen v. Babrab, Inc.,* 438 So.2d 356, 357 (Fla.1983) (toleration of disorderly conduct); *Stevens v. Jefferson,* 436 So.2d 33, 35 (Fla.1983) (same); *Hall v. Billy Jack's, Inc.,* 458 So.2d 760 (Fla.1984) (inadequate security measures); *Mata v. Mata,* 105 Cal.App.4th 1121, 130 Cal.Rptr.2d 141 (2003) (same). The tavern owner, as the person or entity in the best position to prevent violence on a day to day basis, is charged with a legal duty to take reasonable steps to ensure the safety of its patrons.

Two cases from other jurisdictions are particularly instructive on this point because of their factual similarities to our case. In *Loomis v. Granny's Rocker Nite Club,* 250 Ill.App.3d 753, 189 Ill.Dec. 696, 620 N.E.2d 664 (1993), the plaintiff, a 19 year old male, was assaulted at a bar and sued the nightclub for negligently failing to provide adequate security to prevent the assault. *Id.,* 189 Ill.Dec. 696, 620 N.E.2d at 665. The assault occurred during the nightclub's weekly Wednesday night "fanny" contest, "which involves male and female volunteer contestants competing for cash prizes by dancing on the dance floor." *Id.* The fanny contest drew a rowdy crowd and many believed that underage drinking contributed to the rowdiness. *Id.,* 189 Ill.Dec. 696, 620 N.E.2d at 668. Evidence was presented that, given the large crowd, access to security personnel was difficult. *Id.* Loomis's claim against the night-

club had two counts: a dram shop liability count and a negligence count. *Id.*, 189 Ill.Dec. 696, 620 N.E.2d at 665. The jury found for the nightclub on the dram shop count, but it found that the nightclub "was negligent in failing to have adequate security to stop a physical altercation on the nights of the fanny contests when it knew or should have known that such contests would result in a large and rowdy group of patrons." *Id.*

On appeal, the nightclub challenged (1) the trial court's determination that the nightclub owed a duty to protect Loomis from an assault by a third party and (2) whether the jury's verdict was manifestly against the weight of the evidence. *Id.*, 189 Ill.Dec. 696, 620 N.E.2d at 668. The Illinois appellate court affirmed the judgment of the circuit court. In upholding the trial court's imposition of a duty, the appellate court stated that "evidence was presented that the altercation was reasonably foreseeable by [the nightclub] and that defendant could have prevented it or could have at least interfered in the altercation prior to Loomis sustaining the injuries. . . ." *Id.* The appellate court also found sufficient evidence in the record to uphold the jury's verdict that the defendant should be held liable for negligence. *Id.*

In *Hall v. Billy Jack's, Inc.*, the plaintiff was hit over the head with a pool cue by another patron in the parking lot of Billy Jack's Lounge. 458 So.2d at 761. Hall sought damages against Billy Jack's for the assault on a negligence theory (Hall did not pursue a dram shop liability claim). *Id.* The jury awarded damages but the intermediate appellate court reversed, holding that no evidence supported a finding that Billy Jack's knew or should have known that Hall would be attacked without provocation. *Id.* The Supreme Court of Florida reversed, stating that although "a tavern owner is not required to protect the patron from every conceivable risk," the tavern owner owes "a duty to protect against those risks which are reasonably foreseeable." *Id.* The Court explained that "[f]oreseeability may be established by proving that a proprietor had actual or constructive knowledge of a particular assailant's inclination toward violence or by proving that the proprietor

had actual or constructive knowledge of a dangerous condition on his premises that was likely to cause harm to a patron." *Id.* The Court continued: "A dangerous condition may be indicated if, according to past experience (i.e. reputation of the tavern), there is a likelihood of disorderly conduct by third persons in general which might endanger the safety of patrons or if security staffing is inadequate." *Id.* at 762. The Florida Supreme Court remanded the case to the lower court on the foreseeability question, i.e., to determine whether Billy Jack's knew or should have known of a risk of harm that existed on its premises. *Id.*

The analyses of *Loomis* and *Hall* are consistent with those of *Scott, Moore* and *Corinaldi.* The circuit court erred when it concluded that Iguana Cantina did not owe a duty to Troxel.

## B. Breach

■■■ A duty is breached when a person or entity fails to conform to an appropriate standard of care and, in doing so, fails to protect third persons against unreasonable risks. *B.N. v. K.K.,* 312 Md. 135, 141, 538 A.2d 1175 (1988). In *Todd v. Mass Transit Admin.,* 373 Md. 149, 816 A.2d 930 (2003), the Court of Appeals discussed the concept of a breached duty of care in the context of third party criminal conduct. Todd sued the MTA for personal injuries that he sustained when he was attacked by other passengers on an MTA bus. *Id.* at 152, 816 A.2d 930. The circuit court granted summary judgment in favor of the MTA concluding that the MTA did not have a duty to take affirmative action to protect Todd from the attack. *Id.* at 154, 816 A.2d 930. The Court of Appeals reversed, concluding that "to determine, as a matter of law, that [the bus driver's] actions"—i.e. pulling to the curb and pressing the bus's "panic button" four to five minutes after the assault commenced—"satisfied the required standard of care would be inappropriate." *Id.* at 166, 816 A.2d 930. The Court stated that a reasonable inference could be drawn that "had [the bus driver] stopped, pushed the panic button, and opened the bus doors immediately, the attackers could have fled at once." *Id.* at 169, 816 A.2d 930. The Court concluded that

"[w]hether [the bus driver's] failure to take this action before he did constituted a breach of MTA's duty of care is a question for the jury." *Id.*

■ Similarly, in this case, the evidence is sufficient to create a question for the fact finder as to whether Iguana Cantina breached its duty to Troxel. Fred Del Marva, an expert witness retained by Troxel, submitted an affidavit stating that he was professionally qualified to comment on the industry standards of care in serving alcoholic beverages to customers at nightclubs and to provide expert opinions on the causes and effects stemming from alcohol service. Del Marva stated that Iguana Cantina's "college night" promotions "created a substantial risk of injury to business-invitee patrons" and that "violent behavior such as brawls, beatings, and the like are the fully-expected consequence of underage alcoholic consumption in crowded night club environments." [4]

Moreover, Del Marva stated that Iguana Cantina could have taken simple steps to minimize the risk of injury within its premises. Pertinent to our discussion, Del Marva commented that

[e]levated platforms, used by security, to monitor crowded dance floors is an effective crowd control method that should have been, but was not, implemented by Iguana Cantina, and Iguana Cantina's security personnel were not trained or stationed so that they could observe what was occurring in the mixed-age dancing crowds and react quickly to stop fights or acts of violence or to intervene to provide assistance in other events causing injury to Iguana Cantina's patrons.

A fact finder could reasonably conclude that Iguana Cantina, given the history of criminal conduct occurring within its premises, breached its duty to provide adequate security to

---

**4.** At the time of the summary judgment hearing, there was a pending Motion to Strike Plaintiff's Designation of Expert Witness (Del Marva). The trial court did not rule on the motion, nor did it grant summary judgment on any material objected to in the motion. Del Marva's affidavit, therefore, is part of the record and we have considered it.

protect its patrons from violent attacks. It is a reasonable inference that Iguana Cantina should have had more security guards patrolling the nightclub, or should have had security guards stationed in more strategic locations, or should have abandoned the "college night" promotion altogether. We conclude that whether Iguana Cantina's security measures constituted a breach is a question ripe for the fact finder.

## C. Causation

In their brief, appellees argue that causation cannot be established because Troxel failed to present any evidence "that the patrons [5] who assaulted him (1) were underage, (2) had consumed alcoholic beverages on Appellee Iguana Cantina's premises, (3) were, in fact, intoxicated and (4) assaulted him because they were intoxicated." However, in order for Troxel to prove causation in a premises liability context, he need not prove any of the four facts enumerated by appellees. Rather, Troxel must show that it was more likely than not that appellees' conduct was a substantial factor in producing his injuries and that his injuries were a foreseeable result of appellees' conduct. *Pittway Corp. v. Collins*, 409 Md. 218, 244, 246, 973 A.2d 771 (2009). The proper focus in a premises liability claim—as much as appellees try to shift

---

**5.** Both before the circuit court and this Court, Troxel asserts that the assailants were patrons of Iguana Cantina. Appellees did not challenge this contention in their motion for summary judgment nor do they do so before this Court.

In any event, the evidence in the record is as follows: According to Jason Sine, the head of security at Iguana Cantina, on the morning in question, "there were three security personnel stationed at the entrance to the club" who "checked the identification of all patrons" and "[o]ne or two security personnel ... stationed at the exit to the club." Sine also explained that security personnel at both the entrance and exit "had clickers that would mechanically keep track of the number of individuals entering the nightclub and the number of individuals exiting the nightclub." Moreover, the only profit that Iguana Cantina earned on its "college nights" derived from the $12 entrance fee; thus, Iguana Cantina had a significant financial incentive to ensure that the non-employees in the club were in fact paying patrons, not trespassers. From this evidence we conclude that a fact finder could reasonably infer that the assailants were indeed patrons.

the conversation—is on the acts and omissions of the landowner, not the individual assailant.[6] Thus, we turn to a consideration of whether a jury could reasonably conclude that Iguana Cantina's acts or omissions proximately caused Troxel's injuries.

It is a basic principle that "[n]egligence is not actionable unless it is a proximate cause of the harm alleged." *Pittway*, 409 Md. at 243, 973 A.2d 771 (quoting *Stone v. Chicago Title Ins.*, 330 Md. 329, 337, 624 A.2d 496 (1993)). "To be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *Id.* at 243, 973 A.2d 771 (quoting *Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 156–57, 642 A.2d 219 (1994)).

Causation-in-fact concerns the threshold inquiry of whether a defendant's conduct actually produced an injury. *Pittway*, 409 Md. at 244, 973 A.2d 771. Where it is possible that two or more independent negligent acts brought about the injury, we use the substantial factor test. *Id.* Under this

---

6. As a secondary argument on the issue of causation, appellees shift the responsibility not to the assailants, but to Troxel himself. As stated in appellees' brief: "Appellant ignores the most likely cause of the assault—the fact that Appellant, unprovoked, shoved a young lady to the ground just moments before the altercation."

Exactly how the altercation commenced is a matter of intense factual dispute between the parties. Several witnesses have varying accounts of how the incident evolved. There is evidence in the record that Troxel may have initiated the fight by pushing Ms. Marie Zoscak to the ground, but there is also evidence that the incident with Ms. Zoscak was unrelated to the ensuing fight. In her deposition, Ms. Zoscak testified that "I just kind of, like, hit the ground. And then I got up and I asked [Troxel], like, what was that for? . . . you know, what happened, and then he apologized. So it seemed like he was calming down and like everything was fine."

When Ms. Zoscak was questioned about what happened after Troxel began arguing with her acquaintance, Josh Johnson, Ms. Zoscak stated that "After that, they kind of just, like, backed off. Like, Josh was backing off because I was, like, you should just stop, it's not a big deal. And then, like, a group of guys just kind of came and, like, hit [Troxel], and then a fight broke out." Ms. Zoscak was unable to identify the assailants.

For the purposes of our review, we view the facts in the light most favorable to Troxel.

test, causation-in-fact may be found if it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries. *Id;* RESTATEMENT (SECOND) OF TORTS § 431 (1965).

Once causation-in-fact is established, "the proximate cause inquiry turns to whether the defendant's negligent actions constitute a legally cognizable cause of the complainant's injuries." *Pittway,* 409 Md. at 245, 973 A.2d 771.

> This part of the causation analysis requires us to consider whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected. Legal causation is a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established. The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct.

*Id.* at 245–46, 973 A.2d 771 (internal citations omitted). Moreover, injuries that result from a highly extraordinary event will not be deemed foreseeable; in such a case, a court may declare the intervening force to be a superseding cause of the plaintiff's injuries. *Id.* at 247, 973 A.2d 771; RESTATEMENT (SECOND) OF TORTS § 435(2) cmt. c (1965). To determine whether an event is a superseding cause, we consider both the foreseeability of the harm suffered by the plaintiffs as well as the foreseeability of any potential intervening acts. *Pittway,* 409 Md. at 253, 973 A.2d 771.

Thus, whereas the causation-in-fact analysis is guided by the substantial factor test, the legal causation analysis is grounded in foreseeability. *Id.* at 252, 973 A.2d 771. In either case, "[i]t is well established that, unless the facts admit of but one inference ... the determination of proximate cause ... is for the jury." *Id.* at 253, 973 A.2d 771 (citations and quotations omitted). Only in cases where reasoning minds cannot differ does proximate cause become a question of law. *Id.*

In *Griffith v. Southland Corp.,* 94 Md.App. 242, 617 A.2d 598 (1992), *aff'd on other grounds,* 332 Md. 704, 633 A.2d 84

(1993), "an off-duty police officer became the victim of a savage beating while attempting to restore order on the premises of a 7–11 store owned by the appellee, The Southland Corporation." *Id.* at 245, 617 A.2d 598. Under Griffith's version of the facts, the clerk behind the counter at the 7–11 twice refused to summon assistance by calling 911 and only on the third occasion after Griffith's son dialed 911 did she assist by giving the operator the store's address. *Id.* at 247, 617 A.2d 598. "About two minutes later, a county police car arrived; appellant was then lying on the ground and the three assailants were attempting to leave the 7–11 parking lot in their vehicle. The entire episode occurred over a period of about seven minutes." *Id.* at 247–48, 617 A.2d 598. The trial court issued summary judgment on behalf of The Southland Corporation. *Id.* at 248, 617 A.2d 598.

This Court reversed the judgment of the trial court and concluded that the Southland Corporation could be liable for its employee's failure to summon assistance. We concluded that the employee's "refusal to act was an event in the nature of a 'hidden danger.' " *Id.* at 253, 617 A.2d 598. On the issue of proximate cause, this Court rejected appellee's argument "that Griffith's injuries were suffered at the hands of the three teens whose conduct was an independent superseding cause." *Id.* at 250, 617 A.2d 598. We stated that "[n]egligence which constitutes a proximate cause of an injury need not necessarily be the sole cause" and that "proximate cause . . . is an issue to be decided at trial by the trier of fact." *Id.* Upon remand, we concluded that it should be determined "whether Southland's employee did, indeed, telephone the police when requested to do so and whether, if the employee did not make the call, that failure was the proximate cause of Griffith's injuries." *Id.* at 246, 617 A.2d 598.

Likewise, in *Merhi v. Becker,* 164 Conn. 516, 325 A.2d 270 (1973), the Supreme Court of Connecticut considered the question of proximate cause in a context similar to the factual scenario presented by Troxel. The plaintiff attended an outdoor picnic planned and sponsored by the plaintiff's union, Local 1010, for the benefit of its union members and their

guests. *Id.* at 272. Approximately 500 people attended the picnic and, for an admission price of $1.50, the patrons were entitled to all of the food and beer they desired. *Id.* Local 1010 hired one police officer to regulate the grounds. *Id.* Eventually, an intoxicated patron at the picnic, who was involved in several altercations during the course of the picnic, drove his car in the area of the picnickers and struck and injured the plaintiff. *Id.* The plaintiff brought a negligence action against Local 1010 for failing to protect its invitees against reasonably anticipated dangers and the jury returned a verdict in his favor. *Id.* at 271. The union appealed from the verdict and judgment rendered against it, arguing, among other things, that "even if the jury found the defendant negligent, it could not reasonably have found that its negligence was the proximate cause of the plaintiff's injuries." *Id.* at 273.

The Supreme Court of Connecticut disagreed with the union and upheld the jury's verdict on both the evidence and the law. On the question of cause-in-fact, the court stated:

> If a defendant's negligence was a substantial factor in producing the plaintiff's injuries, the defendant would not be relieved from liability for those injuries even though another force concurred to produce them. And, where the negligence of the actor creates the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct. Restatement (Second), 2 Torts § 442[ ].[7] Even assuming

---

7. Section 442 of the Restatement (Second) of Torts states:

> The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:
> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

that [the assailant's] acts constituted an intervening force, that would not, in itself, relieve the defendant Local 1010 of liability, for the harm caused to the plaintiff was, as the jury found, within the scope of the risk created by the defendant Local 1010's conduct.

*Id.* at 273–74 (internal case citations omitted). On the question of legal causation, the court reasoned:

Here, the jury could have found ... that the inadequate policing of a large crowd served alcoholic beverages all day created the foreseeable risk that boisterous and angry occurrences might result in injury to bystanders, and that this risk became more obvious once the brawls involving [the assailant] occurred. Consequently, no matter how one characterizes the exact nature of [the assailant's] action in harming the plaintiff, the jury could reasonably have found that it constituted an instance of the general kind of harm that the defendant's negligence would cause, i.e., harm to patrons from inadequately deterred, raucous, violent conduct.

*Id.* at 273.

The analysis used in *Griffith* and *Merhi* applies to this case. Here, on the issue of cause-in-fact, a jury could reasonably conclude that Iguana Cantina's failure to provide adequate security was a substantial factor in bringing about Troxel's

---

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

The Court of Appeals in *Pittway* stated that Section 442 of the Restatement (Second) of Torts establishes the law in Maryland "for determining when an intervening negligent act rises to the level of a superseding cause." 409 Md. at 248, 973 A.2d 771.

injuries. Reasoning minds could disagree on whether Troxel's injuries could have been prevented if appellees provided safer security measures, i.e., more security guards, more strategically placed security stations, or more adequately trained security personnel. Certainly, that the harm was brought about by unknown assailants does not, by itself, relieve appellees of liability. This was the exact type of risk that Iguana Cantina was charged with a duty to protect against. Thus, contrary to appellees' assertions, they cannot be relieved from liability for Troxel's injuries simply because he was attacked by unknown patrons.

On the question of legal causation, when viewing all facts, and all reasonable inferences drawn from the facts, in a light most favorable to Troxel, the evidence suggests that his injuries were the foreseeable result of a typical night at Iguana Cantina. It was foreseeable from the previous incidents of violence that a large, rowdy crowd might accumulate in Iguana Cantina; that a physical altercation might occur on the dance floor; that it might be difficult to detect a physical altercation without certain security measures in place; and that a person like Troxel might suffer a physical injury as a result of violence inflicted by third persons at the nightclub. A jury could reasonably conclude that these college nights facilitated such an environment of disorder and violence that the injuries sustained by Troxel were foreseeable.

This causation analysis is consistent with the decisions in *Scott v. Watson*, 278 Md. 160, 359 A.2d 548 (1976), and *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship*, 375 Md. 522, 534–35, 826 A.2d 443 (2003). In each case, the Court of Appeals relied on Section 448 of the Restatement (Second) of Torts (1965), which reads as follows:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless* the actor at the time of his negligent conduct *realized or should have realized the likelihood that such a situation might be created,* and that a

third person *might avail himself of the opportunity to commit such a tort or crime.*

RESTATEMENT (SECOND) OF TORTS § 448 (1965) (emphasis added); *Scott,* 278 Md. at 172–73, 359 A.2d 548; *Hemmings,* 375 Md. at 559–60, 826 A.2d 443. The Court of Appeals in *Scott* concluded that allowing "the landlord's negligence to be a proximate cause of the plaintiff's injury," as imagined by § 448 of the Restatement, "would seem to be a fair solution of the causation problem in this context." *Scott,* 278 Md. at 172–73, 359 A.2d 548. As interpreted by the *Scott* Court, under § 448 of the Restatement, a breach of duty by the defendant will result in his liability in the third party criminal activity context only if the conduct was foreseeable and "the breach enhanced the likelihood of the particular criminal activity which occurred." *Id.* at 173, 359 A.2d 548.

In light of the facts before it, the circuit court erred in determining—on a motion for summary judgment—whether Troxel's injuries were proximately caused by appellees' failure to maintain a safe premises.

Based on the above discussion of duty, breach and proximate cause (and noting that both parties agree that Troxel has indeed suffered significant injury), we conclude that Troxel's negligence claim should have survived a motion for summary judgment.

### III. THE ADMISSIBILITY OF EVIDENCE OF PRIOR DANGEROUS INCIDENTS AT IGUANA CANTINA

 Appellees argue that Troxel "relies on mostly inadmissible and misleading documents in attempt[ing] to fashion an argument that numerous violent and criminal incidents occurred at [ ] Iguana Cantina." Specifically, appellees are concerned about "a listing of 'incidents' prepared by an unknown individual, Baltimore City Crime Maps, Calls for Service reports, incident reports, a newspaper article, and [ ] an e-mail." *Id.* Appellees argue that "such documents should not be considered on appeal" because "[n]one of these documents were supported by affidavit or deposition testimony or were authenticated by, or testified about, by any witnesses, particu-

larly, by anyone employed by the Baltimore City Police Department." *Id.*

 Ordinarily, an appellate court should review a grant of summary judgment only on the grounds relied upon by the trial court. *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995). Likewise, if issues are presented to the trial court, but not decided by the trial judge, the issues generally cannot be raised on appeal. *Burdette v. LaScola,* 40 Md.App. 720, 733, 395 A.2d 169 (1978). We may nevertheless exercise our discretion, pursuant to Rule 8–131(a), to consider a matter not addressed by the trial court if doing so would aid the trial court on remand or prevent another appeal. *Montgomery County Bd. of Educ. v. Horace Mann Ins. Co.,* 154 Md.App. 502, 518–19, 840 A.2d 220 (2003).

Here, the trial court did not rule on the admissibility or relevancy of the documents, nor did it base any portion of its decision, oral or written, on a finding that the documents could not be considered. No action by the parties or by the trial court has stricken the documents from the record. We see no compelling reason to abide by appellees' request. Even if we wanted to follow appellees' instruction to ignore certain documents in the record, we would not know which documents to ignore; appellees have failed to object to specific exhibits in the record or provide specific reasons for their objections. The burden does not rest on this Court to go through the record, item by item, to determine which sections of which documents are admissible and which are not. Accordingly, we have considered the full record that was presented to the circuit court.[8]

---

8. We note that, even if we did not consider the exhibits that appellees object to on appeal, we would still have before us the affidavit of Zachary Belcher, and other relevant deposition testimony from security guard Charles E. Shannon and bartender Joshua W. Jones, all of which provide evidence that Iguana Cantina had notice of violence and dangerous conditions within its premises. Our conclusion does not rely on, nor do we understand Troxel's theory of the case to rely on, crime maps, newspaper articles or e-mails.

THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS VACATED AND THE CASE REMANDED TO IT FOR FURTHER PROCEEDINGS CONSISTENT WITH THE OPINION.

APPELLEES TO PAY COSTS.

We must also point out that some of the information that appellees object to in this case—i.e., incident reports from the Baltimore City Police Department—is exactly the type of information relied upon in *Scott* and *Hemmings* to find that a landowner may owe a duty to an occupant if there is evidence of prior violence on the premises.